ROBERT SCHERER, JR., a Minor, by Robert Scherer, his Father and Next Friend, Plaintiff-Appellant, *v.* RAVENSWOOD HOSPITAL MEDICAL CENTER, Defendant-Appellee.

First District (2nd Division)   No. 78-174

Opinion filed April 10, 1979.

James B. Rosenbloom and Alvin E. Rosenbloom, both of Chicago (Goldberg, Kohn, Bell, Black & Rosenbloom, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and John D. Cassiday, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff appeals from an order entered by the trial court sitting without a jury granting defendant's motion for a "directed verdict" at the close of plaintiff's evidence. This case in part involves the issue of whether a mutual mistake of fact existed so as to authorize setting aside a release executed by plaintiff through his father and next friend in favor of defendant. No findings were made by the trial judge with respect to any factual issues.

During the fall of 1961, when plaintiff was less than two months old, he was admitted to the Ravenswood Hospital Medical Center (sometimes hereinafter referred to as "Hospital"), for surgical correction of an umbilical hernia. He developed an infection after the operation and was placed in isolation. On October 16, 1961, he was discovered lying on the floor next to his crib, the side of which was in the down position. X rays taken immediately thereafter revealed a skull fracture; however, upon his release from the hospital a short time later he appeared to be responding well and no abnormal findings were disclosed by neurological tests.

Plaintiff was examined several times thereafter by a pediatrician, Dr. T. J. Hoerchler, including an evaluation at St. Anthony's Hospital in Rockford, Illinois, for a vomiting problem, skull X rays, and routine neurological examinations, which took place during the period between December 30, 1961, and April 12, 1962. He was believed to have made a satisfactory and complete recovery, his skull fracture having been deemed not serious.

A petition was filed on plaintiff's behalf in the probate court of Cook County on October 18, 1962, which stated *inter alia* "* * * that the injuries sustained by said minor consisted of injuries to the head, which revealed a linear fracture" and "* * * that at this time treatment is complete and the above minor is well and normal." The petition was verified by plaintiff's father and certified by his attorney, Drake Leoris, with the statement that he had conferred with Dr. T. J. Hoerchler and all parties involved in this incident and as a result thereof recommended to

the court that the offer made in the amount of \$1,500 be accepted. It was his opinion that the amount offered was adequate in light of the facts, circumstances and the injuries sustained. On October 18, 1962, the probate court by order approved the settlement.

When plaintiff was four or five years old, his father began to notice that his "coordination was off." Subsequent examination by psychologists and a neurologist revealed that plaintiff's brain had been damaged as a result of his fall in October of 1961 and that as a consequence plaintiff is mentally retarded.

Suit was filed on plaintiff's behalf alleging, among other things, cerebral dysfunctioning and impairment, resulting in an inability to learn and limitation of intellectual development stemming from the injury sustained on October 16, 1961. Defendant moved to dismiss, asserting that the claim was barred by reason of the probate court order. On his own motion, plaintiff filed an amended two-count complaint thereafter. In count I thereof he sought to vacate the probate court order; to set aside any release executed on behalf of plaintiff in connection therewith; and alleged that the court order was based upon the mutually mistaken belief of each party as to the nature and extent of the injuries sustained by plaintiff. The cause was transferred to the chancery division because of the equitable relief sought. Defendant's motion to dismiss count I of the amended complaint was denied by the chancellor, which order was affirmed by the appellate court in an interlocutory appeal taken by defendant. The cause was remanded for an evidentiary hearing on the issue of a mutual mistake of fact. *Scherer v. Ravenswood Hospital Medical Center* (1974), 21 Ill. App. 3d 637, 316 N.E.2d 98.

After remand, plaintiff filed a second amended complaint containing three counts, counts I and III sounding in negligence, and count II alleging mutual mistake. Defendant answered counts I and II and moved to dismiss count III. On November 25, 1976, the case proceeded in the law division to a bench trial. The court heard opening statements, ruled on certain objections raised in evidence depositions, and considered evidence consisting of documents, stipulated testimony and the evidence depositions themselves. No other evidence was presented by plaintiff. Defendant presented no evidence and moved for a "directed verdict." After taking the cause under advisement, the trial court granted defendant's motion on September 28, 1977, from which plaintiff appeals.

For the reasons hereinafter stated, we reverse and remand with directions. The following analysis presumes, for purposes of this appeal only, that defendant's liability is uncontroverted, an issue which was not reached prior to judgment.

Plaintiff contends that the trial court's order could have been based only upon an erroneous interpretation of applicable law which permits

the release to be set aside because the parties were mutually mistaken as to the extent of plaintiff's injuries. He asserts that the evidence clearly and convincingly supports his theory of mutual mistake. Defendant argues that at the time of the settlement the parties were aware that plaintiff might have sustained brain damage and of possible future consequences from the injury; therefore, judgment was properly entered in its favor.

■■ Releases may be set aside in equity where there appears to be mutual mistake with respect to the nature and extent of the injury sustained. (*Ruggles v. Selby* (1960), 25 Ill. App. 2d 1, 18, 165 N.E.2d 733.) Because settlement and compromise are favored and the release is an abandonment of a claim by a person against whom the claim exists when the release is executed with knowledge of its meaning, a party who contends that the release was secured by fraud, misrepresentation or mistake must prove his case by clear and convincing evidence. (*Ogren v. Graves* (1976), 39 Ill. App. 3d 620, 622, 350 N.E.2d 249; *Willis v. Reum* (1978), 64 Ill. App. 3d 146, 148, 381 N.E.2d 46.) A unilateral or self-induced mistake is insufficient to void a release; the mistake of fact with respect to the injuries suffered by plaintiff must be mutual. (*Florkiewicz v. Gonzalez* (1976), 38 Ill. App. 3d 115, 120, 347 N.E.2d 401.) The burden of proving the invalidity of a release rests upon plaintiff; defendant is not required to establish the absence of a mutual mistake of fact. (*Blaylock v. Toledo, Peoria & Western R.R. Co.* (1976), 43 Ill. App. 3d 35, 37, 356 N.E.2d 639.) The modern trend is to set aside releases of personal injury claims in situations where the facts, when finally known, present an unconscionable result because of the equitable principle of doing justice under the circumstances of each case. *Kiest v. Schrawder* (1978), 56 Ill. App. 3d 732, 735, 372 N.E.2d 442; *Meyer v. Murray* (1979), 70 Ill. App. 3d 106, 112.

From the evidence presented to the trial court, it clearly appears that nothing in the diagnoses and prognoses by Dr. Joseph Abbate, who examined plaintiff after his fall at the Hospital, and Dr. T. J. Hoerchler, who made physical and neurological examinations of plaintiff during several months thereafter, mentioned the possibility of cerebral dysfunction and impairment of which plaintiff's parents, his attorney or the probate court were advised prior to settlement. When Leoris discussed settlement with defendant's insurance representative and forwarded materials and documents to them, it was his understanding from all the information he gathered that the child had made an uneventful recovery and the only injury considered between the parties was plaintiff's skull fracture, although brain damage "could have been" mentioned, because a skull fracture was involved. If Dr. Abbate were called to testify it was stipulated he would state that certain X rays were taken immediately after plaintiff's fall from his crib which revealed a

fractured skull and a swollen area at the site of the fracture, and that certain neurological tests were made at that time with no abnormal findings noted. Dr. Hoerchler, the pediatrician to whom plaintiff was brought in Rockford on December 30, 1961, and under whose care plaintiff remained until April 12, 1961, treated plaintiff more cautiously than he would other patients of a similar age because of his head trauma. Although he was "sure" that he "would mention" the possibility of central nervous system damage to plaintiff's father to justify more frequent than normal examinations, he could not find anything in his records to support that tentative suggestion. If he had found any evidence that there was in fact permanent brain damage he would have told the father that it existed. He had no record of having discussed with plaintiff's parents on December 30, 1961, the possibility of mental retardation. In his letter to Leoris, on February 14, 1962, he stated that plaintiff's growth and development to date were satisfactory and that based on all that was known to him the prognosis was excellent. When last seen by him on April 12, 1962, plaintiff's developmental landmarks were occurring at the proper age.

The parties further stipulated that Dr. Benjamin Kessert, a specialist in neurology and psychiatry, if called as a witness, would testify that a skull fracture is an injury evidencing trauma to the head, as is brain damage, but that the presence of one does not necessarily suggest the presence of the other. In an evidence deposition, Dr. Joseph Wepman, professor of psychology, surgery and education at the University of Chicago testified that an injury to the brain sufficient to cause mental retardation would not necessarily reveal symptoms at the time of the injury and that the injury to the brain need not be significant, but can be minute in order to cause mental retardation. The father testified that he "guessed" that he and Dr. Hoerchler discussed whether anything was "mentally wrong" with Robert but that "* * * the doctor said that he was doing so well, and was just growing good and coming along excellent I never thought anything, you know." He also said on cross-examination that his lawyer told him that there was nothing wrong with the boy, and all he could get for him was $1,500, the amount for which the case was settled.

Defendant urges that the record demonstrates knowledge of the possibility of permanent brain damage which might manifest itself in the future. The Hospital argues that this is inferrable on the part of the doctor and the father at the time of the settlement because: it is common knowledge that the brain is encased within the skull which was fractured; at plaintiff's age of 13 months at the time of probate, the parties knew he could not relate symptoms and brain function could not be evaluated by analyzing his verbalization of concepts; at plaintiff's age they knew that

his muscular and nervous systems were largely undeveloped and brain function could not be analyzed by observing his performance of even simple tasks; and that there was direct evidence that the pediatrician had advised plaintiff's father that permanent brain damage as well as consequent mental retardation was a possibility. We disagree.

■ As the analyses in the preceding paragraphs reveal, the medical experts unanimously concluded that the mere existence of a skull fracture does not necessarily suggest the presence of permanent brain damage. Neurological tests were made directly after the fall with the benefit of X rays and no abnormal findings were made although the treating pediatrician considered possible central nervous system injury because of the head trauma. He determined to his own satisfaction that there was no long-term damage and that plaintiff was developing normally. Any tentative mention that he "would have made" to the baby's father concerning the "possible" injury aside from the skull fracture was vitiated by his reassurance to the father that plaintiff's growth and development were satisfactory and normal. His letter to plaintiff's attorney also so stated. Contrary to defendant's assertion that the possibility of retardation was known by plaintiff's father, Dr. Hoerchler refused to state that the parents asked him that question or that he mentioned that possibility to them. His records revealed no such discussion. We are dealing here with the human mind and body, still one of the most complicated and fathomless mechanisms probed by man. Certain injuries or pain may be insignificant, or possibly may lead to drastic consequences, as in this case. "Yet, man cannot and does not live in dread of these possibilities. He accepts assurances that all will be well, even though ultimate consequences cannot be appraised * * *." (*Clancy v. Pacenti* (1957), 15 Ill. App. 2d 171, 177, 145 N.E.2d 802.) The evidence at the close of plaintiff's case in chief demonstrates fulfillment of his burden of proving with clear and convincing evidence that permanent brain damage, cerebral dysfunction, leading to mental retardation was in fact an unknown and unexpected consequence. *Scherer v. Ravenswood Hospital Medical Center* (1974), 21 Ill. App. 3d 637, 639-40, 316 N.E.2d 98.

Circumstances similar to those prevailing in the case before us existed in *Ruggles v. Selby.* There, initial medical examination following plaintiff's injury resulting from an automobile collision disclosed contusions of the skull, elbow and knee with no evidence of fractures. Plaintiff appeared to recover; returned to work within five days; and was discharged as a patient. Acting upon information received from plaintiff and his doctor, defendant obtained a release for a sum approximating damages to plaintiff's car and his then medical bills. Subsequently, subdural hematoma was discovered which produced a condition of aphasia from which plaintiff became wholly incompetent. The decision of

the chancellor in that case setting aside the release as the result of mutual mistake of fact was affirmed by the appellate court. Both in *Ruggles* and in the instant case it appears that no symptoms or other indications of the damage that subsequently resulted had appeared prior to settlement. Defendant would distinguish *Ruggles* on the ground that the plaintiff there was an adult whose actual condition was capable of being medically evaluated; however, nothing in that case suggests plaintiff's hematoma was in fact any more discoverable at the time of the settlement than mental retardation was in the instant case.

Plaintiff also relies upon *Reede v. Treat* (1965), 62 Ill. App. 2d 120, 210 N.E.2d 833, in which the trial court was affirmed by the appellate court in setting aside a release executed by that plaintiff following an automobile accident in which she sustained a neck injury. X rays taken failed to reveal dislocation or other serious injury and plaintiff settled her claim. Subsequently, she was discovered to have an unanticipated vertebrate injury requiring major corrective surgery and extensive rehabilitative therapy. In affirming the trial court, the appellate court noted factors there which also appear in the instant case: (i) that the parties believed plaintiff had recovered at the time of the release; (ii) the condition was one which ordinary X rays and customary examination did not reveal; and (iii) the evidence justified the conclusion that the plaintiff acted with reasonable diligence in ascertaining the extent of injury. Defendant attempts to distinguish *Reede* based on the absence of evidence there that the plaintiff had been advised as to the possible future consequences of her injury, whereas in the instant case both plaintiff's father and attorney had been informed by Dr. Hoerchler of the possibility of long-term brain damage. The actual statements of these witnesses, however, previously alluded to, demonstrates the tenuousness of this argument. The only positive, direct evidence in this regard was that plaintiff had fully recovered and was developing normally. Defendant also argues that in *Reede* there was no reason to believe that plaintiff's true condition could not be immediately evaluated; however, further tests were available to plaintiff in *Reede*. The examination which would have disclosed the nature and extent of the injury was beyond her financial means. In the instant case, plaintiff was thoroughly examined. No further tests were suggested nor were plaintiff's father or lawyer advised that by virtue of plaintiff's age, further testing years later was advisable in order to determine whether plaintiff had fully recovered or not. They were informed that recovery was complete and it was upon this belief that all parties relied in settling the case, insofar as the record presently shows.

Defendant cites *Bellomo v. Lincoln Savings Bank* (1960), 201 N.Y.S.2d 24, 23 Misc. 2d 632, for the proposition that mental retardation is a foreseeable consequence of a skull fracture sustained by a young child.

In that case, however, the court specifically found no causal connection in the evidence there submitted between the skull fracture and the ensuing mental retardation, a situation factually inapposite to that in the case at bar.

An additional indicium of mutual mistake in the instant case is the amount of the settlement, $1,500, which, after medical and legal expenses, produced a net recovery to plaintiff of approximately $750. In *Florkiewicz v. Gonzalez*, the appellate court noted that a significant factor indicating mistake is the amount of money accepted as consideration for the release. The amount of consideration in that case did not demonstrate an understanding or intent on plaintiff's part that the nominal sum was to redress any injuries other than those minor injuries for which she had been treated. (38 Ill. App. 3d 115, 121.) See also *Welsh v. Centa* (1966), 75 Ill. App. 2d 305, 313, 221 N.E.2d 106.

■ The monetary settlement in the instant case clearly supports the thesis that neither plaintiff nor defendant contemplated permanent brain damage leading to mental retardation as a possible consequence of plaintiff's injury, particularly in view of the life-time costs of maintenance and education which would have resulted from such an injury. Plaintiff's attorney, Leoris, testified that his experience in personal injury matters required that he consider permanency of injury, including any type of crippling or deformity, among those factors which determine the seriousness of the injury and the resulting monetary figure acceptable for settlement of the claim. He made the determination that no brain damage or permanency was anticipated in this case; had there been information of such a possibility, the settlement figure would have been neither realistic nor fair. Defendant's representative, with whom Leoris actively negotiated the settlement, could not have thought otherwise; to have done so would have been "* * * tantamount to an admission of fraud on its part." (*Ruggles v. Selby* (1960), 25 Ill. App. 2d 1, 19.) Plaintiff's father testified that because nothing was wrong with the child, all his attorney could get from defendant was $1,500 in settlement of the claim. Defendant's argument that the settlement figure in 1962, while not substantial, was nevertheless sufficient with respect to its economic value at the time is unsupportable and beyond the realm of credibility.

In its final contention, defendant asserts that the amount of settlement in the present case contrasts sharply with the amounts involved in the cases on which plaintiff relies, citing *Florkiewicz v. Gonzalez*, in which a settlement of $30 was set aside, *Ruggles v. Selby*, in which settlement of $900 for both plaintiff and his wife was set aside, and *Reede v. Treat*, in which a $125 settlement was set aside. This suggestion is not helpful in determining whether mutual mistake of fact existed at the time of

settlement in the instant case, since, as previously noted, each case must be decided upon its own facts.

Where, as in the instant case, the evidence reveals an injury involving such pervasive damage as permanent mental retardation, resulting from cerebral dysfunction; the settlement is in an amount significantly disparate to the seriousness of the injury; and the injury is an unanticipated, extraordinary complication, then a mutual mistake of fact has been clearly and convincingly proven which, if allowed to stand, will result in an unconscionable hardship to plaintiff. (*Florkiewicz v. Gonzalez; Ruggles v. Selby; Welsh v. Centa.*) The finding of the trial court to the contrary on the present state of the record is against the manifest weight of the evidence and must be reversed.

For the foregoing reasons, the cause is reversed and remanded with directions to vacate the finding and judgment for the defendant at the close of plaintiff's case in chief and to hear such further evidence with respect to the issue of mutual mistake of fact as the parties may wish to further adduce. In the event defendant elects to stand upon the record with respect to this issue, the cause should continue for trial of the other issues raised by the second amended complaint and answer.

Reversed and remanded with directions.

STAMOS, P. J., and PERLIN, J., concur.