[No. 14855-9-I.   Division One.   April 23, 1986.]

JAMES E. BENNETT, *Appellant,* v. SHINODA
FLORAL, INC., ET AL, *Respondents.*

*Davies, Roberts, Reid, Anderson & Wacker* and *Denny Anderson,* for appellant.

*Lee, Smart, Cook, Martin & Patterson* and *Eugene Bolin, Jr.,* for respondents.

SCHUMACHER, J.*—James Bennett brought this damage action against George Wasilche and Shinoda Floral, Inc., for injuries received in an automobile collision. The trial court granted a defense motion for summary judgment and dismissed the action because Bennett had signed a release of all claims. Bennett appeals.

On August 23, 1982, Bennett was driving his automobile

---

*This appeal was heard by a Supreme Court Justice and two retired Superior Court Judges sitting as Court of Appeals Judges Pro Tempore in Division One.

when it was struck from the rear by a Shinoda Floral truck driven by Wasilche in the course of his employment. Almost immediately, Bennett felt back pain and, on the same day, consulted Dr. L. C. Hoover who had treated him in the past. Dr. Hoover found "interspinous ligament tenderness in the dorsal, lumbar and sacral portions of [Bennett's] back" and concluded that he had a back sprain. He informed Bennett, and Bennett believed, that his back injury would heal within a reasonable time period so that he could go back to work.

About 2 weeks later, Floyd Barker, a claims adjuster for Aetna Casualty and Surety Company, met with Bennett. The outcome of this meeting was Barker's assurance that Aetna would pay Bennett's lost wages and medical expenses pending his return to work.

During the fall of 1982, Bennett consulted Dr. Hoover periodically, but continued to have problems with his back so that the date of his expected return to work remained uncertain. In October 1982, Barker obtained a written report from Dr. Hoover stating that Bennett's prognosis and the date he could return to work remained undetermined. In the first part of December 1982, Barker informed Bennett that Aetna was terminating any further wage loss payments and would like to settle his claim. Barker offered Bennett a final payment of $5,000 and informed him that this was all the insurance company would pay.

At the time of the collision, Bennett was 56 years old and had been a truck driver for Safeway Stores since 1958. His prior employment consisted of manual labor and cooking in the United States Navy. His formal education had ended at about the 10th grade, and he had received no technical training. Except for a divorce many years before, Bennett had never consulted an attorney and had never been involved in a contested claim. In the course of his years as a truck driver, Bennett had experienced numerous episodes of back pain and problems for which he had received treatment. He had always recovered and returned to work within a relatively short period of time.

Bennett discussed Aetna's $5,000 offer with his wife. At that time, they were receiving no income from his employment and had savings of about $100. Bennett was anticipating the receipt of vacation pay from his employer in January 1983. Believing that the $5,000 from Aetna together with the vacation pay would satisfy their requirements until he could go back to work, Bennett and his wife decided to accept the offer. On December 6, 1982, the same day the settlement offer was made, and without further negotiation, Bennett accepted Aetna's offer and signed a written release "of all claims of every nature and kind whatsoever . . . known and unknown, suspected and unsuspected." The total amount paid to Bennett by Aetna for lost wages, medical expense and final settlement was $13,487.76.

In early 1983, Bennett's back condition worsened. Dr. Hoover eventually concluded that the collision had caused a "herniated intravertebral disc in [Bennett's] low back . . . a different and much more serious condition than the sprain which was originally diagnosed." In March 1984, Dr. James Mowry examined Bennett and reported:

> I think Mr. Bennett's primary diagnosis is degenerative disc disease of the lumbar spine. It has been slowly progressive for many years, and its development has been the result of innumerable injuries, as described above. The violence of his most recent injury, that being the motor vehicle accident, finally produced enough symptomatology to prevent his returning to work.
>
> . . .
>
> It is often difficult to predict the course of low back injuries. It is now clear that Mr. Bennett has sustained injuries and symptoms therefrom arising out of the August, 1982 accident. The nature and extent of his injuries as well as their permanence were not readily apparent in December, 1982, when, I understand it, Mr. Bennett signed a release. I believe it would not have been unreasonable for Mr. Bennett to have believed in December, 1982, that he would recover and be able to return to work. It is also apparent, now, that he has sustained permanent injuries as a result of the accident and

some components of his symptomatology have developed since December, 1982. In particular the radiating pain in his legs is a significant form of injury which was not known by either Dr. Hoover or Mr. Bennett in December, 1982. The radiating pain is likely to be connected with injury to one or more discs in Mr. Bennett's lower spine and, as indicated, the possibility of disc injury was not apparent in December, 1982.

Many patients who are involved in automobile accidents experience sometimes disabling symptoms for some period of time before they improve. In some instances there is improvement and in other instances the symptoms can remain severe and, as happened in Mr. Bennett's case, permanent. Given his history of prior back problems and successful recovery from them, it would not have been reasonable or possible to have predicted the course of his injuries in December, 1982. It was only after he continued to have symptoms, and developed new components to his injury, during 1983, that one could finally make a prognosis of permanent disability as have both I and Dr. Hoover.

One reason for difficulty in making a precise diagnosis of long–term injury with patients having back problems is that some of the components of the injury are not "objectively" verifiable. There are tendons, ligaments, and muscles in the low back that can all be scarred or injured in ways that don't show up on x–rays. There can be disc problems which initially, again, are not susceptible to analysis through ordinary x–rays or other diagnostic techniques. This is why it is often necessary to wait some considerable length of time before making any kind of confident prediction or evaluation of a patient's back problems.

Both Doctors Hoover and Mowry finally concluded that Bennett is permanently and totally disabled as a result of the collision.

The issue raised on appeal is whether, as a matter of law, an injury victim is bound by a release executed when the releasor was aware that he had been injured but was unaware of the serious nature and extent of the injuries.

Until recent times, this State, along with most jurisdictions, applied ordinary contract law to releases of injury

claims. An injury victim seeking to avoid a signed release, the terms of which were clear, was usually required to prove that the release was the result of mutual mistake, the various tests of which are detailed in *Pepper v. Evanson,* 70 Wn.2d 309, 422 P.2d 817 (1967), *overruled on other grounds in Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984). In most instances, this imposed an almost impossible burden upon the injured party. The evidence to prove mutual mistake had to be clear and convincing. *Spratt v. Northern Pac. Ry.,* 90 Wash. 592, 156 P. 563 (1916). The mistake had to be one of fact rather than opinion, so that a physician's prognosis could not be the basis of mutual mistake. *Lambert v. State Farm Mut. Auto. Ins. Co.,* 2 Wn. App. 136, 467 P.2d 214, *review denied,* 78 Wn.2d 993 (1970). Where the terms of the release were clear, they could not be limited. *Schwieger v. Harry W. Robbins & Co.,* 48 Wn.2d 22, 290 P.2d 984 (1955). And where both parties relied upon the claimant's medical report, the mistake was not mutual but rather was unilateral on the part of the claimant. *Pepper.*

However, in *Finch v. Carlton,* 84 Wn.2d 140, 524 P.2d 898 (1974), the Supreme Court rejected the more rigid contract law approach of *Pepper,* stating at page 144:

> The better reasoned rule adopted by an overwhelming majority of jurisdictions permits the avoidance of a release in circumstances where later–discovered injuries were clearly not contemplated by the parties at the time of release.

and at pages 145–46:

> The rationale employed by a majority of jurisdictions does not permit the avoidance of a release merely because of the discovery of a previously unknown injury, but instead allows an inquiry into *whether the release was fairly and knowingly made.*

(Italics ours.)

*Finch* involved a situation where the claimant–releasor was unaware at the time of executing the release that he had sustained *any* bodily injuries and received a settlement

of $880.21, the exact amount of his automobile repair bill. He nevertheless signed a general release purporting to forever discharge any claims for bodily injuries as well as property damage.

Since *Finch,* two Court of Appeals decisions have concluded that the "fairly and knowingly" test was intended to apply only when the releasor was unaware of *any* bodily injury when he signed the release and not when "the parties have been mistaken about future development of a known injury." *Stottlemyre v. Reed,* 35 Wn. App. 169, 174, 665 P.2d 1383, *review denied,* 100 Wn.2d 1015 (1983); *Woods v. Gamache,* 14 Wn. App. 685, 544 P.2d 144 (1975). Both decisions revert back to the mutual mistake rationale of *Pepper* and *Lambert.* This court, however, is unable to find any persuasive reason to distinguish between a case where the releasor believes his injuries to be minor when in fact they are totally and permanently disabling and a case where the releasor has sustained injuries but does not know it. In both situations, the releasor is giving up his claim for injuries of which he has no knowledge. Both situations should invoke the policy of the law that "strongly favors the just compensation of accident victims." *Finch,* at 145.

In determining whether a release has been fairly and knowingly made, *Finch* suggested use of the five factors expressed in Judge McInturff's dissent to the Court of Appeals decision in *Finch v. Carlton,* 10 Wn. App. 32, 39, 516 P.2d 212 (1973), *rev'd,* 84 Wn.2d 140, 524 P.2d 898 (1974):

> (1) the peculiar dignity and protection to which the law cloaks the human person, as contrasted with articles of commerce; (2) the inequality of the bargaining positions and relative intelligence of the contracting parties; (3) the amount of consideration received; (4) the likelihood of *inadequate knowledge concerning future consequences of present injury to the human body* and brain; and (5) the haste, or lack thereof, with which release was obtained.

(Italics ours.)

Judge McInturff's test was derived, at least in part, from

*Clancy v. Pacenti,* 15 Ill. App. 2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77 (1957), the facts of which are remarkably similar to this case. Mrs. Clancy's automobile was rear–ended, but it did not appear that her injuries were serious. Her doctor diagnosed a sprained back and prognosticated a complete recovery. She signed a release for the amount of her property damage plus $50 or $60 for her injuries. Later, it developed that she had herniated discs in her low back. In upholding the trial court's action of setting aside the release, the Illinois court stated that "a settlement made without regard to an undisclosed physical condition cannot stand because the settlement was for the injuries and damages disclosed and then known to the parties." *Clancy,* at 176. (For cases of other jurisdictions, *see* Annot., *Modern Status of Rules as to Avoidance of Release of Personal Injury Claim on Ground of Mistake as to Nature and Extent of Injuries,* 13 A.L.R.4th 686 (1982).) We believe the Supreme Court in *Finch* intended to apply the "fairly and knowingly" test to those situations where the releasor is unaware of the serious nature and extent of his injuries when he signs the release.

Whether or not a release is fairly and knowingly made is an issue of fact. *Finch,* at 144; *Casey v. Proctor,* 59 Cal. 2d 97, 378 P.2d 579, 28 Cal. Rptr. 307 (1963). If there is sufficient evidence to create a genuine issue as to whether a release has been fairly and knowingly made, a summary judgment should not be granted. In this instance, the materials offered in opposition to the motion for summary judgment established that Bennett's physician diagnosed a back sprain and advised Bennett that he would return to work within a reasonable amount of time. Because Bennett had always recovered from similar back problems, he believed he would recover again and return to work. Due primarily to symptoms which developed after the signing of the release, the doctors who examined Bennett have concluded that he has a herniated disc and as a result is totally and permanently disabled. In exchange for his release, Bennett received payment of medical expenses incurred to

the date of the release, his loss of wages for about 3 months and a final payment of $5,000. At the time of the collision, Bennett was earning approximately $2,500 per month so that the final $5,000 payment was the equivalent of about 2 months' wages. This evidence is sufficient to raise a genuine issue of material fact bearing on whether Bennett's release was fairly and knowingly made.

The judgment is reversed and the cause remanded.

COLE and UTTER, JJ. Pro Tem., concur.

Review granted by Supreme Court July 8, 1986.