[Nos. 52758–0, 52846–2. En Banc. July 2, 1987.]

JAMES E. BENNETT, *Respondent*, v. SHINODA FLORAL, INC., ET AL, *Petitioners*.

JAMES T. HOGGATT, JR., *Petitioner*, v. TIMOTHY L. JORGENSEN, ET AL, *Respondents*.

*Lee, Smart, Cook, Martin & Patterson, P.S., Inc.,* by *John Patrick Cook* and *Eugene N. Bolin, Jr.,* for petitioners Shinoda Floral, et al.

*Joseph C. Calmes* and *Harrison, Davis & Calmes,* for petitioner Hoggatt.

*Davies, Roberts, Reid & Wacker,* by *Rob Williamson* and *Bruce Heller,* for respondent Bennett.

*Merrick, Hofstedt & Lindsey, P.S.,* by *Asa D. Glazer,* for respondents Jorgensen.

*Robert H. Whaley, Bryan P. Harnetiaux,* and *Gary N. Bloom* on behalf of Washington Trial Lawyers Association, amici curiae.

*Stephen P. Larson* and *Marcus B. Nash* on behalf of Washington Association of Defense Counsel, amici curiae.

DURHAM, J.—In these two consolidated cases, the plaintiffs brought actions for damages for personal injuries. In both cases, the trial courts granted defense motions for summary judgment on the ground that the plaintiffs had executed releases of all claims.[1] The issue we must decide is if the victims are bound, as a matter of law, by releases executed when they knew they had been injured, but did not know the extent or consequences of the injuries. The releases signed by both plaintiffs stated:

> It is understood and agreed that this is a full and final release of all claims of every nature and kind whatsoever, and releases claims that are known and unknown, suspected and unsuspected.

We hold that such releases are binding.

## Bennett v. Shinoda Floral

On August 23, 1982, James Bennett was driving his automobile when it was struck from behind by a Shinoda Floral, Inc. truck driven by George Wasilche in the course of his employment. Following the collision, Bennett felt back pain. On the day of the collision, he consulted Dr. L. C. Hoover, an osteopathic physician and surgeon. Dr. Hoover

---

[1]Each case was reviewed by a different panel at Division One of the Court of Appeals. The trial court's judgment in *Bennett v. Shinoda Floral, Inc.,* 43 Wn. App. 504, 717 P.2d 1379 (1986), was reversed by an "ABLE" panel sitting pursuant to CAR 26. In *Hoggatt v. Jorgensen,* 43 Wn. App. 782, 719 P.2d 602 (1986), the trial court's judgment was affirmed.

diagnosed a lumbosacral and dorsal sprain. Dr. Hoover told Bennett that although his injury would temporarily disable him from working at his job as a truck driver at Safeway Stores, it would heal within a reasonable period of time, allowing him to go back to work. Bennett expected that he would be able to return to work.

Aetna Casualty and Surety Company represented Wasilche and Shinoda Floral. About 2 weeks after the collision, Floyd Barker, a claims adjuster for Aetna, contacted Bennett. Barker assured Bennett that Aetna would pay his medical expenses and lost wages while he was unable to work.

During the fall of 1982, Dr. Hoover continued to treat Bennett for his back pain. In October 1982, Barker received a report from Dr. Hoover stating that Bennett's prognosis, as well as the date he could return to work, was undetermined.

In early December 1982, Barker informed Bennett that Aetna was terminating his wage loss payments. On December 6, 1982, Barker told Bennett that Aetna wanted to settle his claim and offered $5,000 as a final payment, telling Bennett that this was all Aetna would pay. Bennett discussed the offer with his wife. The Bennetts thought that the $5,000, along with vacation pay due him from Safeway in January 1983, would be sufficient to meet their needs until Bennett could return to work. The same day the offer was made, Bennett accepted it and signed a release "of all claims of every nature and kind whatsoever . . . that are known and unknown, suspected and unsuspected."

In the early spring of 1983, Bennett's back condition worsened. Dr. Hoover eventually concluded that, as a result of the collision, Bennett had a herniated intravertebral disc in his low back, and that this was a different and much more serious condition than the sprain which was originally diagnosed. Dr. Hoover concluded that this condition would prevent Bennett from returning to any kind of employment.

In March 1984, Dr. James Mowry, an orthopedic surgeon, examined Bennett and diagnosed degenerative disc disease of the lumbar spine. Dr. Mowry determined that this condition had been slowly progressive for many years, developing as a result of innumerable injuries, and that the violence of the August 23, 1982, accident "finally produced enough symptomatology to prevent his returning to work." Dr. Mowry also observed that

[t]he nature and extent of his injuries as well as their permanence were not readily apparent in December, 1982 . . . [I]t would not have been unreasonable for Mr. Bennett to have believed in December, 1982, that he would recover and be able to return to work. . . . Given his history of prior back problems and successful recovery from them, it would not have been reasonable or possible to have predicted the course of his injuries in December, 1982.

Dr. Mowry concluded that Bennett is permanently and totally disabled.

In April 1983, Bennett brought this action for damages against Wasilche and Shinoda Floral, who asserted the release as an affirmative defense. The trial court granted the defendants' motion for summary judgment and dismissed the action. The Court of Appeals reversed. This court granted the defendants' petition for review.

Hoggatt v. Jorgensen

On March 2, 1980, James T. Hoggatt, Jr. was injured when the motorcycle he was riding left the roadway while he was attempting to pass an automobile driven by Timothy L. Jorgensen. Liability is disputed. Hoggatt was hospitalized and was diagnosed as having compression fractures of two vertebrae. His physicians found that there was no evidence of spinal cord compression or any other complications from these fractures. According to Hoggatt, his physicians told him that the injuries would heal and he would be able to return to work.

Within a few weeks of the accident, Hoggatt began settlement negotiations with Pemco, Jorgensen's automobile

insurance carrier. Hoggatt authorized Pemco to contact his physicians and obtain his medical records, and a Pemco claims adjuster received information from his physicians. In a May 13, 1980 letter to Pemco, Hoggatt told Pemco that since the date of the accident he had been in constant pain and was required to take medication; that he had to wear a back brace; that he was unable to bend over to put on shoes; that he had lost 1¼ inches in height as a result of the accident; and that he had been unable to function in his business since the accident. In the letter, he offered to grant a full release to Jorgensen if Pemco would pay him the liability insurance policy limits. On May 15, 1980, Hoggatt and Pemco reached an agreement. In exchange for a cash settlement of $26,500, Hoggatt signed a release providing: "It is understood and agreed that this is a Full and Final Release of all claims of every nature and kind whatsoever, and releases claims that are known and unknown, suspected and unsuspected."

After the release was executed, Hoggatt continued to consult various physicians. There was no change in diagnosis until March 9, 1982, when he was examined by Dr. John Mullins, a neurologist. Dr. Mullins diagnosed a probable spinal cord injury with an associated mild paraparesis. Dr. Mullins indicated that the mild spinal cord injury "may well have been due to a contusion or concussion of the spinal cord at the time of [Hoggatt's] accident in March of 1980." On September 22, 1982, Hoggatt was found to be disabled for purposes of receiving social security disability benefits.

In February 1983, Hoggatt brought this action for damages against Jorgensen, who raised the release as an affirmative defense. The trial court granted Jorgensen's motion for summary judgment of dismissal. The Court of Appeals affirmed. This court granted Hoggatt's petition for review.

## ANALYSIS

In these cases, we must decide if injury victims are bound, as a matter of law, by releases executed when they

knew they had been injured, but did not know the extent or consequences of the injuries. To resolve this issue, we must determine the scope of the decision by this court in *Finch v. Carlton,* 84 Wn.2d 140, 524 P.2d 898 (1974). In order to establish a context for understanding *Finch,* we begin our analysis by reviewing Washington law prior to *Finch* on the voidability of releases.

Before *Finch,* this court established that traditional contract principles applied in deciding if an injured person could avoid a release that he had signed. Where the release was not induced by fraud, misrepresentation or overreaching, it could be set aside only if there was clear and convincing evidence of mutual mistake in its execution. *See Beaver v. Estate of Harris,* 67 Wn.2d 621, 626–27, 409 P.2d 143 (1965); *Pepper v. Evanson,* 70 Wn.2d 309, 312–14, 422 P.2d 817 (1967), *overruled on other grounds in Simonson v. Fendell,* 101 Wn.2d 88, 675 P.2d 1218 (1984). In *Beaver,* the injured plaintiff believed he had a strained back at the time he signed a release, and sought to avoid the release after it was determined that he had a herniated disc. We sustained the release, holding that because the insurer's only information about the plaintiff's condition came from the plaintiff himself, the insurer did not independently make a mistake and, thus, there was no mutual mistake. *Beaver,* at 628–29. In *Pepper,* the injured plaintiff signed a release after experiencing pains in the right side of his neck and in his right arm. Later, he sought to avoid the release when a new disability arose on his left side. We upheld the release, concluding that there was no mutual mistake because the insurer depended on the injured plaintiff's assessment of his injuries. *Pepper,* at 316–17.

The later case of *Finch v. Carlton, supra,* presented facts that differed significantly from those in *Beaver* and *Pepper.* While the plaintiffs in the prior cases had been aware that they were injured at the time they executed releases, the plaintiff in *Finch* had no knowledge whatsoever of any personal injury when he signed a release.

On March 7, 1970, plaintiff Finch was involved in an

automobile accident in which his vehicle collided with defendant's. About 3 days later, Finch met with an insurance adjuster for defendant's insurance company and filled out a claim form. At that time, Finch claimed no personal injuries. He knew, however, that his automobile had been damaged in the collision. On April 7, 1970, 1 month after the accident, Finch signed a release of all claims resulting from the accident, whether on account of bodily injury or property damage, in exchange for the insurer's payment of the cost of repairing his automobile. At the time he signed the release, Finch was not aware that he had any physical injury. In June 1970, he became ill, consulted physicians, and learned that he had internal injuries resulting from the accident. He then brought an action for damages for such injuries.

In considering if the release could be avoided, we recognized that Finch's case was unlike prior cases such as *Pepper,* because it involved "a situation where the parties presumably did not contemplate the possibility of latent injuries." *Finch,* at 143. We concluded that a release may be avoided "where later–discovered injuries were clearly not contemplated by the parties at the time of release." *Finch,* at 144. We stated:

> The rationale employed by a majority of jurisdictions does not permit the avoidance of a release merely because of the discovery of a previously unknown injury, but instead allows an inquiry into whether the release was fairly and knowingly made.

*Finch,* at 145–46. We remanded the case to the trial court to determine if the release was fairly and knowingly made, based on a list of several factors. *See Finch,* at 146.[2]

---

[2]These factors are: "(1) the peculiar dignity and protection to which the law cloaks the human person, as contrasted with articles of commerce; (2) the inequality of the bargaining positions and relative intelligence of the contracting parties; (3) the amount of consideration received; (4) the likelihood of inadequate knowledge concerning future consequences of present injury to the human body and brain; and (5) the haste, or lack thereof, with which release was obtained." *Finch v. Carlton,* 84 Wn.2d 140, 146, 524 P.2d 898 (1974) (quoting *Finch v. Carlton,* 10 Wn. App. 32, 39, 516 P.2d 212 (1973) (McInturff, J., dissenting)).

In the present case, the plaintiffs argue that the *Finch* "fairly and knowingly made" test should apply not only to situations where the releasor is unaware of any injury at the time he signs the release, but also where the releasor knows he has been injured but does not know the extent or consequences of the injury when he executes the release. We conclude, however, that *Finch* must be limited to its facts.[3]

■ As we recognized in *Finch,* there are two competing policies which must be considered in deciding the voidability of releases. On one hand, the law favors the just compensation of accident victims. *Finch,* at 145. On the other

---

[3]The *Finch* opinion itself is ambiguous as to whether this test was intended to apply to situations beyond the facts that existed in that case. On the one hand, the court explicitly distinguished the facts of *Finch* from the prior Washington cases involving releases where there were known injuries, observing:

> The instant case does not involve . . . an informed, negotiated assumption of *known* injuries subsequently compounded by later–discovery of more serious injuries as in *Pepper v. Evanson, supra.* Unlike prior cases, this action presents a situation where the parties presumably did not contemplate the possibility of latent injuries.

*Finch v. Carlton,* 84 Wn.2d at 143. On the other hand, in some of the cases from other jurisdictions cited in *Finch,* the "fairly and knowingly made" test was applied to situations where there were known injuries with unknown consequences. *See Ranta v. Rake,* 91 Idaho 376, 421 P.2d 747 (1966); *Denton v. Utley,* 350 Mich. 332, 86 N.W.2d 537 (1957). In addition, *Finch's* list of criteria to be considered in deciding if the release was fairly and knowingly made includes the following factor: "the likelihood of inadequate knowledge concerning future consequences of present injury to the human body and brain". *Finch,* at 146.

The ambiguity of *Finch's* intended scope is underscored by the divergent approaches taken by the Court of Appeals since *Finch* in cases involving known injuries with unknown consequences. In *Bennett,* the Court of Appeals applied the *Finch* test, *see* 43 Wn. App. 504, 717 P.2d 1379 (1986), while in *Hoggatt* it applied traditional contract principles, *see* 43 Wn. App. 782, 719 P.2d 602 (1986). In *Stottlemyre v. Reed,* 35 Wn. App. 169, 174, 665 P.2d 1383, *review denied,* 100 Wn.2d 1015 (1983), the court stated that the rule permitting avoidance of a release had not been expanded to include cases where, at the time of the release, the parties were mistaken about future development of a known injury. In *Woods v. Gamache,* 14 Wn. App. 685, 686–87, 544 P.2d 144 (1975), where the plaintiff signed a release knowing his knee was injured, and further problems developed in the knee after the release, the court held the case was controlled by *Pepper* and distinguishable from *Finch.* It is interesting to note that *Woods* was written by Judge McInturff, who had originally proposed applying the "fairly and knowingly made" test in Finch's case in a dissent at the Court of Appeals. *See Finch v. Carlton,* 10 Wn. App. 32, 39, 516 P.2d 212 (1973) (McInturff, J., dissenting).

hand, the law favors the private settlement of disputes and gives releases great weight in order to support the finality of such settlements. *Finch,* at 145. *See also Haller v. Wallis,* 89 Wn.2d 539, 544, 573 P.2d 1302 (1978); *Mutual of Enumclaw Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 37 Wn. App. 690, 693, 682 P.2d 317 (1984).

When a person signs a release of all claims and has no knowledge that he has any personal injury, as in *Finch,* it is supportable to permit avoidance of the release once it is found that the release was not executed fairly and knowingly. As this court indicated in *Finch,* at 145, in such a case the policy favoring just compensation of accident victims outweighs the policy favoring finality of private settlements. Because the plaintiff is unaware of any personal injury at the time he signs the release, it is unjust to hold him to the release where it is clear that he did not contemplate the possibility that an injury would arise in the future.

In contrast, when a person signs a release knowing that he has been injured, he assumes some risk that his condition may worsen. As we stated in *Beaver v. Estate of Harris,* 67 Wn.2d 621, 629, 409 P.2d 143 (1965): "[I]t is common knowledge that few diagnoses and prognoses concerning injuries to the human body can be reduced to mathematical certainty." By signing a release when he knows he is injured, a person is aware that there is a chance that he could be left insufficiently compensated if the prognosis changes. He knowingly takes a gamble in agreeing to a settlement. This risk that circumstances will change is inherent in the settlement process.

If we allowed a challenge to the validity of the releases in these cases, we would severely impair the policy favoring private settlements and promoting their finality. In every case where the known circumstances of the injury changed after settlement, the validity of the release would be open to question. The parties to many more settlement agreements would be put through the delay and expense of litigation. *See Beaver,* at 627. The absence of finality would

greatly reduce the incentive to settle personal injury claims, thus impeding timely compensation to injury victims and adding to the congestion crisis in our courts.

In summary, we conclude that the balance between the policies favoring private, final settlement and the just compensation of accident victims can be properly maintained only if the *Finch* test is limited to its facts. We hold, therefore, that the *Finch* test applies only to situations where there is no known injury at the time the release is executed. Because both Bennett and Hoggatt knew they were injured when they executed releases, *Finch* does not apply to their cases.

We must next decide if the releases in these cases are voidable under the law of contracts. It is undisputed in both of these cases that there is no evidence of fraud, misrepresentation, or overreaching. Thus, the releases can be set aside only if there is clear and convincing evidence of mutual mistake.

■ A contract is voidable on grounds of mutual mistake when both parties independently make a mistake at the time the contract is made as to a basic assumption of the contract, unless the party seeking avoidance bears the risk of the mistake. *PUD 1 v. WPPSS,* 104 Wn.2d 353, 362, 705 P.2d 1195 (1985); Restatement (Second) of Contracts § 152 (1981). A party bears the risk of a mistake when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient". Restatement (Second) of Contracts § 154(b) (1981). *See also PUD 1,* at 362; *Armco, Inc. v. Southern Rock, Inc.,* 696 F.2d 410, 412–13 (5th Cir. 1983); *United States v. McBride,* 571 F. Supp. 596, 610 (S.D. Tex. 1983); *Covich v. Chambers,* 8 Mass. App. Ct. 740, 749, 397 N.E.2d 1115 (1979). In such a situation there is no mistake. Instead, there is an awareness of uncertainty or conscious ignorance of the future. *PUD 1,* at 362; *see also* Restatement (Second) of Contracts § 154, comment *c* (1981). Professor Corbin recognizes that this concept of known risk is relevant when

a claimant seeks to avoid a release of a personal injury claim on grounds of a mistake:

> In the absence of misrepresentations, the claimant must show that an injury existed that was outside of his contemplation when he executed the release. In settling any such claim, the claimant knows that there is some degree of uncertainty. In so far as he is aware of uncertainty respecting his future harm and loss, he is consciously exchanging this uncertainty for the liquidated amount received in settlement. To this extent the release is not voidable for mistake.

3 A. Corbin, *Contracts* § 598 (1960).

We believe that in the present cases, the releasors bore the risk of mistake. Both releasors knew that there was uncertainty surrounding the extent or consequences of their injuries at the time they signed the releases. Bennett's back pain had continued for over 3 months from the day he was injured until he signed the release. He entered into the settlement agreement knowing that he was not cured. Likewise, Hoggatt knew that his injury had not healed when he signed the release. He was still in pain and his physical activity was seriously limited because of the accident. By entering into the releases knowing that they were not completely recovered, the releasors here accepted a known risk that the extent or consequences of their injuries might change in the future. Because the releasors bore the risk of mistake, the releases are not voidable due to mutual mistake.

We hold that Bennett and Hoggatt are bound by the releases they signed. The trial courts in both cases are affirmed.

PEARSON, C.J., BRACHTENBACH, ANDERSEN, and CALLOW, JJ., and CUNNINGHAM, HAMILTON, and JAMES, JJ. Pro Tem., concur.

DOLLIVER, J. (dissenting)—I believe there is no principled basis for drawing a distinction between these cases and *Finch v. Carlton,* 84 Wn.2d 140, 524 P.2d 898 (1974). The

language of *Finch,* the cases it cited and others decided since then, and the policies underlying *Finch* cannot support creating a dichotomy between releasors who believe they have no injuries and releasors who believe their injuries to be minor when in fact the injuries are permanently and totally disabling. I must dissent.

The majority concedes the language of *Finch* is ambiguous and does not clearly support its conclusion excluding relief for the injured parties here. See footnote 3. I find the language of *Finch* to support instead the opposite conclusion: the court intended to allow the invalidation of certain releases in circumstances where the plaintiff is already aware of some injury. Most specifically, the *Finch* court stated the evaluation of a release should include consideration of "the likelihood of inadequate knowledge concerning future consequences of *present injury* to the human body and brain . . ." (Italics mine.) *Finch,* at 146 (quoting *Finch v. Carlton,* 10 Wn. App. 32, 39, 516 P.2d 212 (1973) (McInturff, J., dissenting)). What other meaning could this have than an intention to allow relief in circumstances such as those presented here? Additionally, the *Finch* court recognized the policy favoring private settlement of disputes and the desire to "promote the finality of out–of–court settlements", but concluded the policy "strongly favor[ing] the just compensation of accident victims" took precedence in these cases. *Finch,* at 145.

Further, other states which have adopted the fairly and knowingly test used in *Finch* have applied it to known injuries. *See, e.g., Denton v. Utley,* 350 Mich. 332, 86 N.W.2d 537 (1957); *Casey v. Proctor,* 59 Cal. 2d 97, 378 P.2d 579, 28 Cal. Rptr. 307 (1963); *Ranta v. Rake,* 91 Idaho 376, 421 P.2d 747 (1966); *Mangini v. McClurg,* 24 N.Y.2d 556, 249 N.E.2d 386, 301 N.Y.S.2d 508 (1969); *see also* Annot., *Avoidance of Release of Personal Injury Claims on Grounds of Fraud or Mistake as to the Extent or Nature of Injuries,* 71 A.L.R.2d 82 (1960). The majority's position denying further recovery where a plaintiff is aware of some injury prior to signing a release would have resulted in

denial of relief in the following circumstances where other courts have had the wisdom to allow the release to be avoided.

A 14–year–old girl, hit on the head by a machine falling off a truck, signed a release through her parents believing herself to be fully recovered from symptoms diagnosed as hematoma. Almost 4 years after the injury, she suffered the first of a continuing series of post–traumatic epileptic seizures resulting from the original brain injury. *Gleason v. Guzman,* 623 P.2d 378 (Colo. 1981). *See also Krezinski v. Hay,* 77 Wis. 2d 569, 253 N.W.2d 522 (1977) (grand mal epileptic seizures began some time after release signed).

A woman with "very minor" injuries, including superficial abrasions, a bruise, and "muscular skeletal pain" signed a release, then suffered a heart attack over a year after the accident. The treating physician stated the attack "most likely was caused by the auto accident." *Newborn v. Hood,* 86 Ill. App. 3d 784, 785, 408 N.E.2d 474, 13 A.L.R.4th 681 (1980).

During a collision between a train and an auto, a woman "fell to the pavement and . . . skinned both knees . . ." Three weeks after signing a release her knees began to swell. She discovered she had bone splinters and cartilage damage in her knees, requiring surgery and resulting in permanent injury. *Jones v. Union Pac. R.R.,* 504 P.2d 370, 371 (Colo. Ct. App. 1972).

A plaintiff whose only known injuries at the time of signing a release were fractured ribs and bruises was later discovered to have a ruptured spleen, requiring surgery. *Scotton v. Landers,* 190 Colo. 27, 543 P.2d 64 (1975).

A passenger in an automobile accident was originally diagnosed to have one or two cracked or bruised ribs. He later discovered through surgery that two vertebrae had been broken, which had resulted in permanent injury. *Witt v. Watkins,* 579 P.2d 1065 (Alaska 1978).

A plaintiff suffered a broken arm, and learned after signing the release the bones had not united, resulting in permanent disability. *McCarthy v. Eddings,* 109 Colo. 526, 127

P.2d 883 (1942).

In several cases factually similar to Bennett, the plaintiffs originally received diagnoses of minor pulled or strained muscles, only to determine later, after signing releases, the injury involved an intravertebral herniated disc requiring surgery and resulting in permanent disability. *See, e.g., Ranta v. Rake, supra; Dorman v. Kansas City Terminal Ry.*, 231 Kan. 128, 642 P.2d 976 (1982) (railway worker fell 10 feet at work, aware of only laceration on forehead and pain in left thigh, but later diagnosed ruptured intervertebral disc); *Campbell v. Stagg*, 596 P.2d 1037 (Utah 1979) (injury diagnosed as bruises and cervical strain later determined to be herniated cervical disc with compression of nerve roots); *Reynolds v. Merrill*, 23 Utah 2d 155, 460 P.2d 323 (1969) (herniated disc not discovered until over 2 months after the release was signed; originally diagnosed as bursitis).

In each of these cases, the plaintiff signed the release knowing of some injury, but later discovered serious additional injuries, for which the plaintiff had not been compensated, resulting from the accident. The injustice of the inadequate compensation given was just as great as in *Finch*. The majority, however, creates a distinction allowing recovery in *Finch* but in none of these other circumstances.

The majority's position creates a distinction insupportable by policy and analytically unsound. A distinction between known and unknown injuries rewards haste and ignorance by allowing recovery for plaintiffs who sign before any information about injuries is available but not for plaintiffs who wait to obtain some, though ultimately inadequate, information about possible injuries.

The difference between known and unknown injuries is vague and fails to provide the clear distinction the majority seems to indicate. As the court stated in *Gleason v. Guzman*, 623 P.2d 378, 384 (Colo. 1981):

> [T]he distinction between unknown injuries and unknown consequences of known injuries is a useful analytic standard but it does not yield a litmus–type resolu-

tion to these problems. The words [of distinction] are of doubtful application to a considerable number of marginal cases.

(Citations omitted.) *See also Denton v. Utley,* 350 Mich. 332, 340, 86 N.W.2d 537 (1957) (distinction is "peculiarly baffling and, I suspect, not completely understood even by those employing it"); *Witt v. Watkins, supra* at 1069 ("artificial distinction"); Annot., *Modern Status of Rules as to Avoidance of Release of Personal Injury Claim on Ground of Mistake as to Nature and Extent of Injuries,* 13 A.L.R.4th 686, 691 (1982) (distinction is "sufficiently vague to permit a wide area of dispute").

Rather than adopt this distinction, other courts have simply recognized that

> [t]he modern trend is to set aside releases of personal injury claims in situations where the facts, when finally known, present an unconscionable result because of the equitable principle of doing justice under the circumstances of each case.

*Scherer v. Ravenswood Hosp. Med. Ctr.,* 70 Ill. App. 3d 939, 942, 388 N.E.2d 1268 (1979).

I believe the effect of *Finch* was to create an exception from the application of our mutual mistake doctrine, and create a new test for determining the validity of personal injury releases, regardless of whether the plaintiff believed no injuries or only minor injuries had occurred. Other courts have recognized theses cases involving personal injuries as sui generis, requiring the application of a different standard in order to achieve a just result. As one court stated:

> Some courts have recognized that cases of this type are to some degree sui generis and substantially abandon any attempt to fit these situations within the classic limitations of the law of fraud or mistake and have held that the release may be set aside upon a showing of an inequitable result unless it is established that it was "fairly and knowingly made." . . .
> The courts following this policy of avoiding releases where improvidently made are guided by the following

factors: (a) the peculiar dignity the law accords the human person, as distinguished from articles of commerce; (b) the very real possibility of being mistaken about the long range effects of damage to human tissue; (c) the inequality of the bargaining positions of the contracting parties; and (d) the amount of consideration received compared to the risk of the existence of unknown injuries.

(Citations omitted.) *Ranta v. Rake,* 91 Idaho 376, 380, 421 P.2d 747 (1966). *See also Herndon v. Wright,* 257 S.C. 98, 103, 184 S.E.2d 444 (1971).

The complexities of the human body do not always fit neatly into the needs of an insurance company to close a case file expeditiously, and an injured person should not be left uncompensated merely because the responses of the body to the trauma failed to conform to an insurer's time schedule. The law in this area should take into account the reality that the ultimate consequences of an injury may take a long period to discover, regardless of the efforts of the plaintiff or the quality of medical services. I do not find any policy to support the majority's view that the risk of discovery of additional disability from the injury must fall upon the injured person, rather than upon an insurer whose obligation it is to compensate fully that person for injuries suffered. The result of the majority's position is to give the insurer the windfall of avoiding liability for a risk it has been paid to assume. *See Casey v. Proctor,* 59 Cal. 2d 97, 111, 378 P.2d 579, 28 Cal. Rptr. 307 (1963).

The majority also implies the invalidating of these releases would spell disaster for the entire settlement process, bringing the validity of every release into question. See majority opinion, at 395. This "floodgates" argument has been attacked by other courts:

> We do not fear, as did the court in Reinhardt v. Wilbur, 30 N.J. Super. 502, 105 A.2d 415 (1954), that this decision will open the floodgates to recurrent challenges in the courts of releases honestly secured. Our decision does no more than provide just relief in those relatively few cases where it would be inequitable to hold the release a

bar to later action or renewed negotiation because the injuries sustained prove more serious than could reasonably have been foreseen by any of the parties at the time the release was executed. This leaves free that much larger area and more frequent situation where out-of-court settlement is satisfactorily and equitably achieved.

*Ranta v. Rake, supra* at 382. The court in *Denton v. Utley, supra,* also spoke to this issue:

The arguments against relief . . . are not new. Nor is it new that they are framed in terms of the most fearful consequences to the then-existing social order. . . .

. . . Where once the courts were admonished, with respect to the law of trusts, to roil not the conscience lest any gentleman in England be presumed out of his entire estate, to disturb not the letter of the conveyance, lest all security transactions be jeopardized, now we are warned to leave untouched the letter of the release, lest no claim ever be settled, and litigations mount. The argument *in terrorem* fails here, as it has always failed, and for precisely the same reason: We exist solely to do justice and it shall be done.

*Denton v. Utley, supra* at 341-42.

The "fairly and knowingly" test is not a recent one, nor is its application to known injuries recent. The test was used as early as 1939 (*Farrington v. Harlem Sav. Bank,* 280 N.Y. 1, 19 N.E.2d 657 (1939)) and has been consistently used for decades to apply to known as well as unknown injuries. Keefe, *Validity of Releases Executed Under Mistake of Fact,* 14 Fordham L. Rev. 135 (1945). The "floodgates" argument of the majority ignores both the need to achieve individualized justice in these cases and the long history of use of the "fairly and knowingly" test by other jurisdictions.

I believe the policy considerations discussed in *Finch* and elsewhere favor the application of the "fairly and knowingly" standard to these two cases. The fairness element would involve consideration of the circumstances leading to the signing of the release. In addition to the ordinary inquiry into elements of fraud, misrepresentation, or overreaching, a court should consider the various advantages

the insurer has in the settlement process. Insurers have more experience in predicting the course of injuries and greater awareness of the risk of continuing disability. An insurer can also subtly or directly take advantage of the difficult financial and emotional circumstances of the injured party to persuade agreement to a release.

The knowledge element would involve consideration of the actual knowledge of the releasor. A release signed without knowledge of the seriousness of the injury, based upon a reasonable belief only minor or temporary injuries were sustained, cannot be said to be "knowingly" made within the requirement of *Finch. See generally Denton v. Utley, supra* at 343–44.

The *Hoggatt* opinion below (*Hoggatt v. Jorgensen,* 43 Wn. App. 782, 719 P.2d 602 (1986)) did not even mention the *Finch* case or the "fairly and knowingly made" test it established for reviewing the validity of personal injury releases. Instead it relies, as does the majority here, upon the harsh contract doctrine of mutual mistake. I would reverse the *Hoggatt* decision and remand for application of the proper standard at a summary judgment under *Finch*: does a genuine issue of fact exist regarding whether the release was fairly and knowingly made. The burden should be upon the releasor to establish by clear and convincing evidence the reasons for setting aside the release. *Witt v. Watkins,* 579 P.2d 1065, 1070 (Alaska 1978); *Ranta v. Rake, supra* at 380. Only if the court determined the plaintiff specifically contemplated and bargained for the assumption of risk of future injuries, including the risk of permanent injury, then the release might be found to be fairly and knowingly made. I believe the *Bennett* opinion (*Bennett v. Shinoda Floral, Inc.,* 43 Wn. App. 504, 717 P.2d 1379 (1986)) applied the *Finch* standard properly and would affirm.

Reconsideration denied September 4, 1987.