AUGUST DeMARIE, Plaintiff-Appellee, v. THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY, Defendant-Appellant.

First District (1st Division)    No. 78-2026

Opinion filed December 3, 1979.

Lord, Bissell & Brook, of Chicago (Cornelius P. Callahan and Hugh C. Griffin, of counsel), for appellant.

Edward J. Kelly, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant Baltimore and Ohio Chicago Terminal Railroad Company appeals from a jury verdict awarding plaintiff August DeMarie $125,000 for injuries he received when the truck he was driving was struck by one of defendant's switch trains. Prior to trial, defendant filed a motion to dismiss on the grounds that plaintiff had previously signed a release acknowledging receipt of $7500 "in full settlement and satisfaction of all

his claims arising out of the accident." The motion was denied and the cause proceeded to trial. At the close of plaintiff's case and again at the close of all the evidence, defendant moved for a directed verdict. Believing that the validity of the release was an issue of fact to be determined by the jury, the trial court denied the motion and submitted the issue to the jury, along with plaintiff's negligence claim. Defendant appeals.

On appeal, defendant argues that the trial court committed reversible error (1) by denying its motion for a directed verdict and (2) by allowing plaintiff to introduce evidence of his adverse family and financial circumstances to the jury.

We reverse.

On July 25, 1972, plaintiff August DeMarie was hauling a load of stones on the premises of his employer, The Edmier Industrial Company. The stones were to be dumped into a storage bin adjacent to a switch track operated by defendant. Plaintiff had been employed by Edmier for 12 years and knew that defendant's switch trains operated on the tracks throughout the day. He admitted knowing that one had to watch for trains and proceed with caution whenever entering the premises. He further admitted that on this particular day, however, he failed to do so.

As plaintiff began dumping the load into one of the bins near the tracks, one of defendant's trains struck the bumper and fender of plaintiff's truck. Though the train was travelling at slow speed, plaintiff testified that the impact threw him to the passenger side of the truck cab and twisted his upper and lower back, causing a sharp pain.

The engineer testified that although he was looking down the track at all times, he was unable to see plaintiff's truck until he was 20 feet away, due to a curve in the tracks. Though the engine bell was ringing from the time the train began moving, plaintiff was unable to hear it because he was revving the truck engine as he raised the dump bed.

Immediately after the accident, plaintiff was taken to a clinic for examination. After an hour, he was given some pain pills and sent home. He later went to an ear specialist who told him that he had lost some hearing in his right ear.

During the next five weeks, plaintiff remained home from work and visited the clinic almost every day. Two weeks after the accident he began complaining of back pain. Dr. Larsen testified that X rays taken at that time revealed some intervertebral disc narrowing between the L4-L5 lumbar region of the spine. Such narrowing does not necessarily indicate a slipped disc and for this reason, Dr. Larsen did not inform plaintiff of the possibility of a slipped disc. It was Dr. Larsen's opinion that plaintiff had merely strained his back.

At the end of the five-week period, plaintiff was referred to another

doctor who examined him and advised him to return to work. He returned to work but continued to experience back pain. Finally, at the insistence of his employer, he consulted a physical therapist who administered vibration and massage treatments. Plaintiff also continued taking whirlpool baths and alcohol rubs at home.

The evening of the July 25, 1972, accident, one of defendant's claim agents called plaintiff at home to inquire about his condition. The conversation was general. Several days later, the agent personally visited plaintiff at home to further discuss the accident. Again, the conversation was general; the possibility of settling any claims was not discussed.

The agent maintained regular contact with plaintiff until he returned to work in September of 1972. At about that time, defendant received plaintiff's medical reports. Thereafter, the agent began calling plaintiff every other day to discuss the possibility of a settlement.

At first, plaintiff and his wife were not interested in settling. Though plaintiff had returned to work, he continued to have pain. Both plaintiff and his family noted that his back had become crooked and also that he had begun dragging his leg when he walked. Nevertheless, in late October of 1972, plaintiff called defendant's claim agent and expressed his willingness to settle his claim.

On November 2, 1972, two of defendant's claim agents met with plaintiff and his wife at their home. Plaintiff informed the agents that he was still having problems and undergoing treatment. Defendant's agents first offered $4,000 or $5,000 and then $6,000. When plaintiff suggested that he wanted to see a lawyer, one of the agents allegedly stated that a lawyer was not necessary and added further that "all the lawyer would do is take one-third." Plaintiff then stated that he would be willing to accept $10,000. Finally, a figure of $7500 was agreed upon by the parties.

After agreeing upon the $7500 figure, plaintiff and his wife were presented with a $7500 settlement check. Before accepting the check, however, they both read the settlement which released defendant from all further claims. In the presence of two of their children plaintiff and his wife signed the release.

Plaintiff continued to have back problems subsequent to the signing of the release. In the summer of 1973, plaintiff underwent surgery for the removal of one of his lower lumbar discs. The pain returned and in November of 1975, he had another disc removed. As a result of these operations, plaintiff's medical expenses and loss of earnings amounted to $17,000.

On April 5, 1974, plaintiff filed the instant negligence suit against defendant. Defendant moved to dismiss the action on the basis of the release. The motion was denied and defendant then filed its answer, pleading the release as an affirmative defense. Plaintiff filed a reply,

alleging that the release was executed as the result of a mutual mistake of fact and/or the result of fraudulent misrepresentations by defendant. The case then proceeded to trial.

During the trial and over defendant's objections, plaintiff was allowed to introduce evidence of economic pressures to which he and his wife were subjected at the time of the release. Specifically, evidence was introduced indicating that prior to the November 2, 1972, settlement, plaintiff's wife had an operation and was about to have a hysterectomy. Also admitted was evidence that their son, who had been born with a heart condition and was now attending medical school, had taken the family car and left plaintiff a $50 Rambler.

At the close of plaintiff's case and at the close of all the evidence, defendant moved for a directed verdict. The motions were denied. Plaintiff's negligence claim and the issue concerning the validity of the release, were tendered to the jury. The jury returned a verdict in plaintiff's favor for $125,000. Defendant appeals.

On appeal, defendant first argues that the trial court committed reversible error by denying its motion for a directed verdict, since a valid release precluding plaintiff's recovery had been executed.

■■■ We agree. When determining the validity of a release, the controlling issue is whether the circumstances surrounding the settlement clearly indicate that the release was executed under a mutual mistake of fact as to plaintiff's injuries so that the trial court, in the exercise of its equitable powers, should set aside the release in order to prevent an unconscionable result. (*Kiest v. Schrawder* (1978), 56 Ill. App. 3d 732, 372 N.E.2d 442; *Welsh v. Centa* (1966), 75 Ill. App. 2d 305, 221 N.E.2d 106.) The first part of this test, namely determining whether the parties were acting under the mutual mistake of fact regarding the extent of plaintiff's injuries, is a question to be resolved by the trier of fact. (*Reede v. Treat* (1965), 62 Ill. App. 2d 120, 210 N.E.2d 833.) So, too, are other circumstances surrounding the release such as the mental capacity of the releasor. (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104.) Resolution of these issues is properly made by either the judge or jury. Such is not the case, however, with the second half of the test: determining whether the release should be set aside in order to prevent an unconscionable result. As noted in *Kiest*, this is the primary consideration when determining the validity of a release. It is a question "for the chancellor in equity who is vested with that degree of discretion and flexibility necessary to the doing of justice under the circumstances of each individual case." (*Ruggles v. Selby* (1960), 25 Ill. App. 2d 1, 12, 165 N.E.2d 733, 739.) For this reason the trial court often conducts a separate hearing to determine the validity of the release and if invalid, the case on the merits is submitted to the jury. (*Reede v. Treat* (1965), 62 Ill. App. 2d

120, 210 N.E.2d 833; *Child v. Lincoln Enterprises, Inc.* (1964), 51 Ill. App. 2d 76, 200 N.E.2d 751; *Ruggles v. Selby.*) Other cases have decided the validity of the release by summary judgment procedure. (*Brackeen v. Milner* (1967), 88 Ill. App. 2d 50, 232 N.E.2d 241; *Welsh v. Centa* (1966), 75 Ill. App. 2d 305, 221 N.E.2d 106.) Consequently, we believe that it was error for the trial court in this case to allow the jury to determine whether enforcement of the release would produce an unconscionable result, since this is a question of law.

Not only was it reversible error to allow the jury to determine that enforcement of the release was unconscionable, but recent cases further indicate that their conclusion was manifestly incorrect. In *Welsh*, plaintiff received whiplash injuries in an auto accident. Her physician took X rays and indicated that everything was normal. Seventeen days later she negotiated a $200 settlement with defendant's insurance adjuster and executed a release. Five months later she experienced a severe headache and eventually required hospitalization for a period of 18 days. She was put in traction and required to wear a cervical collar for several months. In a subsequent suit by plaintiff, the trial court granted defendant's motion for summary judgment based on the release. The appellate court, citing *Clancy v. Pacenti* (1957), 15 Ill. App. 2d 171, 145 N.E.2d 802, affirmed, stating:

> " '[I]t is important to preserve a field of action within which parties may compromise their differences with substantial assurance that the matter will not arise again.'

If we do not proceed with caution in this field and the validity of releases be seriously impaired, the result could be an enormous addition to a case load even now overwhelming.

[10] We hold that where an injured party, conscious of the possibility of future consequences from the injury, makes her own investigation as to the nature of her injuries and the prospect of future complications, and, relying on the diagnosis and prognosis of her own doctor, compromises her claim and executes a release without reservation, she is bound thereby. The trial court properly sustained the motion for summary judgment." 75 Ill. App. 2d 305, 313-14, 221 N.E.2d 106, 110.

The same rationale applies in the instant case since plaintiff, too, was aware of the possibility of future consequences from the injury. At the time the release was executed, he was still suffering pain and receiving medical treatment. Though informed that he had merely sprained his back, plaintiff was aware that his back was crooked and that he dragged his leg when he walked. Yet, in spite of these problems he contacted defendant's claim agent and indicated that he wished to discuss a settlement. Under these facts, we cannot conclude that the extent of

plaintiff's injuries was an "unexpected consequence." See *Scherer v. Ravenswood Hospital Medical Center* (1979), 70 Ill. App. 3d 939, 388 N.E.2d 1268; see also *Kiest v. Schrawder* (1978), 56 Ill. App. 3d 732, 372 N.E.2d 442.

Plaintiff argues that the claim agent pressured him into settling through repeated phone calls and his statement that an attorney was not necessary. The facts, however, do not indicate that plaintiff was pressured. Approximately two months passed before defendant's claim agent began calling to discuss a settlement and over three months before the settlement was reached. This is in sharp contrast to other cases where releases were set aside. (See *Florkiewicz v. Gonzalez* (1976), 38 Ill. App. 3d 115, 347 N.E.2d 401 (release executed 3 days after accident); *Smith v. Broscheid* (1964), 46 Ill. App. 2d 117, 196 N.E.2d 380 (release executed 2 weeks after accident); *Fraser v. Glass* (1941), 311 Ill. App. 336, 35 N.E.2d 953 (release executed 6 days after accident).) Here plaintiff had ample opportunity to seek medical treatment and to determine possible legal remedies. As noted, it was plaintiff that finally called the claim agent to arrange the settlement.

Lastly, we note that the $7500 plaintiff received as consideration for the release was not a nominal or unconscionable amount as it was in other instances where a release was set aside. See *Florkiewicz v. Gonzalez* ($30 release for a skull fracture); *Reede v. Treat* (1965), 62 Ill. App. 2d 120, 210 N.E.2d 833 ($125 for a back injury); *Smith v. Borscheid* ($216.99 release for a back injury).

Because we hold that the trial court erroneously denied defendant's motion for a directed verdict and reverse on that basis, we find it unnecessary to address the other issue raised on appeal.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

GOLDBERG, P. J., and O'CONNOR, J., concur.