LOUIS F. WIENEKE, Plaintiff-Appellant, v. BERNARD WEITEKAMP *et al.*, Defendants-Appellees.

Fifth District   No. 5—90—0277

Opinion filed May 27, 1992.

HARRISON, J., concurring in part and dissenting in part.

Jeanne L. Sathre, of Lakin & Herndon, P.C., of Wood River, for appellant.

Stephen R. Cullison, of Cullison & Vandever Law Office, of Hillsboro, for appellee Bernard Weitekamp.

Evan H. Johnson, of Armstrong, Winters, Prince, Featherstun & Johnson, of Decatur, for appellee Nokomis Township.

William L. Berry, of Dunham, Boman & Leskera, of East St. Louis, for appellee Montgomery County.

JUSTICE HENRY LEWIS delivered the opinion of the court:

The plaintiff, Louis F. Wieneke, brought suit against the defendants, Bernard Weitekamp, Nokomis Township, and Montgomery County, seeking compensation for personal injuries suffered in an automobile accident on June 23, 1984. The plaintiff allegedly suffered injuries to his back when he swerved to avoid hitting Bernard Weitekamp's vehicle as it emerged from an intersection. The plaintiff swerved onto the shoulder of the road upon which he was traveling,

and his vehicle bounced over a storm sewer or inlet. The two vehicles did not collide. Plaintiff struck the door handle inside the car on the driver's side. As the plaintiff approached the intersection, he was traveling in a northeasterly direction on Illinois Route 16; defendant was traveling north on Nokomis Township Road. The trial court entered summary judgment in favor of both Nokomis Township and Montgomery County and against the plaintiff. Thereafter, the trial court conducted a bench trial to determine the validity of a release of all claims against Bernard Weitekamp and his insurer executed by the plaintiff prior to the institution of suit. The plaintiff alleged that the release was executed under a mutual mistake of fact as to the nature and extent of his injuries. The trial court determined the issue of the validity of the release to be, in essence, an action for declaratory judgment for which no right to jury trial exists. Following the bench trial on this issue, the trial court entered judgment in favor of Bernard Weitekamp and against the plaintiff and dismissed the complaint with prejudice.

The plaintiff appeals, presenting four issues for review: (1) whether the trial court erred in disallowing plaintiff's request for a jury trial on the issue of the validity of the release and in deciding this issue and the issue of mutual mistake of fact as a matter of law in favor of the defendant Weitekamp; (2) whether the trial court erred in granting the motion of Nokomis Township for summary judgment "on the grounds that the sewer inlet that caused the Plaintiff's injuries was not created or maintained by Nokomis Township and that Nokomis Township owed no duty to Plaintiff, where the sewer inlet was located at an intersection of a Nokomis Township road and a state highway"; (3) whether the trial court erred in granting the motion of Nokomis Township for summary judgment "on the grounds that Plaintiff's driving over a sewer inlet in order to avoid collision with another vehicle was a remote possibility not giving rise to a legal duty"; and (4) whether the trial court erred in granting the motion of Montgomery County for summary judgment on the grounds that this defendant owed plaintiff no duty.

With respect to the issue pertaining to the release, the plaintiff maintains that in Illinois the question of whether a release is voidable for mutual mistake of fact involves questions of fact to be determined by the trier of fact, namely, a jury if one is requested. Plaintiff contends that in deciding these questions of fact "as questions of law," the trial court deprived him of his right to trial by jury.

As was stated in *Welsh v. Centa* (1966), 75 Ill. App. 2d 305, 221 N.E.2d 106, Illinois follows the majority of jurisdictions in allowing a

court to set aside a release executed by a tort victim when the facts indicate that the parties were mutually mistaken as to the extent of the releasor's injuries. In order to avoid the document, the mistake must be mutual, material to the transaction, and affect its substance. (*Meyer v. Murray* (1979), 70 Ill. App. 3d 106, 387 N.E.2d 878.) The rescission or avoidance of a release is a form of equitable relief. (*Welsh*, 75 Ill. App. 2d 305, 221 N.E.2d 106.) When determining the validity of a release, the controlling issue is whether the circumstances surrounding the settlement clearly indicate that the release was executed under a mutual mistake of fact as to the plaintiff's injuries so that the trial court, in the exercise of its equitable powers, should set aside the release in order to prevent an unconscionable result. (*DeMarie v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1979), 79 Ill. App. 3d 50, 398 N.E.2d 248.)

> "The first part of this test, namely determining whether the parties were acting under the mutual mistake of fact regarding the extent of plaintiff's injuries, is a question to be resolved by the trier of fact. (*Reede v. Treat* (1965), 62 Ill. App. 2d 120, 210 N.E.2d 833.) So, too, are other circumstances surrounding the release such as the mental capacity of the releasor. (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104.) Resolution of these issues is properly made by either the judge or jury. Such is not the case, however, with the second half of the test: determining whether the release should be set aside in order to prevent an unconscionable result. As noted in *Kiest* [*v. Schrawder* (1978), 56 Ill. App. 3d 732, 372 N.E.2d 442], this is the primary consideration when determining the validity of a release. It is a question 'for the chancellor in equity who is vested with that degree of discretion and flexibility necessary to the doing of justice under the circumstances of each individual case.' (*Ruggles v. Selby* (1960), 25 Ill. App. 2d 1, 12, 165 N.E.2d 733, 739.) For this reason the trial court often conducts a separate hearing to determine the validity of the release and if invalid, the case on the merits is submitted to the jury." (*DeMarie*, 79 Ill. App. 3d at 53.)

Whether enforcement of the release would produce an unconscionable result is a question of law to be determined by the trial court, not by a jury. *DeMarie*, 79 Ill. App. 3d 50, 398 N.E.2d 248.

The plaintiff herein argues that whether the judge or the jury decides the first part of this test, that is, whether the parties were acting under a mutual mistake of fact concerning the extent of the plaintiff's injuries, depends upon the will of the parties and that if a

party requests that a jury decide the first part of the test, the request is to be granted because this is a question of fact. We disagree. Section 2—1111 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1111) provides: "The court may in its discretion direct an issue or issues to be tried by a jury, whenever it is judged necessary in any action seeking equitable relief." The granting of a jury trial where equitable relief is sought is discretionary with the trial court. (*Djomlija v. Urban* (1982), 107 Ill. App. 3d 960, 438 N.E.2d 558.) Inasmuch as the rescission or avoidance of a release is a form of equitable relief, the granting of a jury trial where such relief is sought is discretionary with the trial court. Although the trial court may in its discretion direct the factual issue of whether the parties were acting under a mutual mistake of fact concerning the extent of the plaintiff's injuries to be tried by a jury whenever it is judged necessary, the trial court is not required to do so. The plaintiff makes no suggestion that the trial court abused its discretion in this regard. The plaintiff was not, as he asserts, deprived of his right to trial by jury. The trial court did not err by considering the question by bench trial whether the parties were acting under a mutual mistake as to the extent of the plaintiff's injuries.

■ In order to set aside a release, the party urging the invalidity of the document has the burden of proving by clear and convincing evidence that there was a mutual mistake of material fact and that the result is unconscionable. (*Newborn v. Hood* (1980), 86 Ill. App. 3d 784, 408 N.E.2d 474; *Welsh*, 75 Ill. App. 2d 305, 221 N.E.2d 106.) The judgment of the trial court will not be disturbed unless it is manifestly contrary to the weight of the evidence. (*Child v. Lincoln Enterprises, Inc.* (1964), 51 Ill. App. 2d 76, 200 N.E.2d 751.) The mistake must be mutual, and a unilateral or self-induced mistake of fact will be insufficient to void a release. (*Martin v. Po-Jo, Inc.* (1969), 104 Ill. App. 2d 462, 244 N.E.2d 851.) When the circumstances surrounding a settlement clearly indicate that settlement was executed under a mutual mistake of fact, the court may act to prevent an unconscionable hardship to the injured party; among such circumstances are a great discrepancy between the amount of the settlement and the amount of ensuing damages, the exercise of pressure to make the settlement, the superior position of an affluent defendant over a needy plaintiff, and the occurrence of an unforeseen and extraordinary complication in the known injuries. (*Welsh*, 75 Ill. App. 2d 305, 221 N.E.2d 106.) However, this remedy must exist in harmony with the policy of encouraging settlement and ending litigation. *Welsh*, 75 Ill. App. 2d 305, 221 N.E.2d 106.

The plaintiff contends that the conclusions of the trial court were manifestly incorrect and against the weight of the evidence. At the bench trial conducted on November 2 and 7, 1989, the evidence showed that after negotiations with the plaintiff the defendant's insurer, Country Companies, who was also the plaintiff's insurer, offered to settle the plaintiff's claim by the use of a structured settlement costing Country Companies approximately $66,000 and providing benefits of approximately $477,000 to plaintiff. The proposed settlement, which the plaintiff accepted in the presence of his father on May 20, 1985, provided for a lump-sum payment of $25,000, the waiver of a subrogation claim of $10,000 for medical payments, and an annuity, purchased for about $31,000 by Country Companies, of $1,843.27 per month for 20 years, which was to commence 15 years after the date of settlement.

Plaintiff asserts that when he signed the release he believed that his back condition was permanently relieved and that he was about to return to work. Approximately nine months after the accident on June 23, 1984, and about two months before plaintiff executed the release on May 20, 1989, Dr. Anthony Marrese performed a lumbar laminectomy on March 13, 1985, to remove the herniated portion of the disc at L4-5 allegedly resulting from the accident. After the surgery, the plaintiff enjoyed dramatic relief from the symptoms he had experienced almost immediately after the accident and for which he had been treated by numerous doctors of his own choosing. Shortly after the release was signed and contrary to plaintiff's expectations, he said, he began to experience a recurrence of symptoms and was found to have a recurrent disc prolapse at L4-5, which was corrected surgically by Dr. Paul Young on September 18, 1987. Plaintiff stated that although he had expected to return to his work of performing physical examinations upon applicants for life insurance shortly after executing the release, he was unable to return to any kind of work until July of 1987, when he opened a video store. Following execution of the release, he incurred additional medical expenses of about $11,000 and lost wages of about $21,000 per year, diminished by about $300 per month after July of 1987 by the proceeds of the video store. At the time of trial he was engaged in farming. He had incurred medical expenses of about $31,000 and lost wages of about $21,000 prior to the execution of the release.

Testifying by evidence deposition taken on behalf of the plaintiff on October 20, 1989, Dr. Marrese indicated that in a report dated April 4, 1985, he had stated that the plaintiff's prognosis at that time

was guarded but that he did think the plaintiff would be able to return to gainful employment in the future. Dr. Marrese testified:

"We warn all our patients it's possible to rupture the same time [sic] disk more than once because we only take out the part of the disk that is pressing on the nerve. There still may be other parts of the disk that is [sic] ruptured, herniated, slipped out of place. We only remove the pressure from the nerve, and more disk can come out of the innerspace like an uncapped tube of toothpaste. And 25 percent of patients have to have repeat surgery."

Dr. Marrese indicated that he had discussed this possibility with plaintiff when recommending the surgery he performed and that plaintiff was aware that in surgery of this kind there is an approximate 25% chance of a need for future surgery and that a possible reherniation of the disc and a possible need for future surgery is the foreseeable result in at least 25% of cases of this kind. He described it as a foreseeable, published complication of this surgery. The plaintiff testified that Dr. Marrese had not told him that after the operation there was a 25% chance he would need further surgery.

George Ginos, an attorney whom the plaintiff had called the day the accident occurred, testified that he had had "at least several dozen" conversations with the plaintiff between June 23, 1984, and the time plaintiff executed the release. He stated that the plaintiff had consulted him concerning the amount he should seek in damages or the advisability of certain amounts in settlement and that he had offered his opinion or advice concerning amounts in settlement. The witness testified that the plaintiff specifically told him that he did not want him to contact Country Companies and never requested that he conduct settlement negotiations for the plaintiff or talk to representatives of Country Companies for him. The plaintiff indicated to the witness that plaintiff and his father would negotiate with Country Companies concerning settlement and that his father would be assisting him in his settlement negotiations. The witness said that he had never contacted Country Companies to inform the insurer that he was an attorney for plaintiff because plaintiff had requested that he not do so. Although the witness had prepared a lien waiver, he did not send it to Country Companies because the plaintiff had asked him not to be involved in his negotiations with Country Companies. The plaintiff had, he said, talked to him about the settlement shortly before May 20, 1985, and the witness had offered his opinions concerning the merits and advisability of structured settlements. He had advised the plaintiff concerning the tax consequences of a settlement. The witness

recalled at least two conversations concerning the merits of the general nature of the settlement. The witness testified that initially he had assumed that he had been retained to do "everything" for the plaintiff with regard to his case, but that after he had explained to the plaintiff what he thought the value of the case was and what his fee would be, plaintiff advised him that he did not want him to negotiate it. Thereafter, the witness restricted himself to advising plaintiff with respect to the merits of specific figures or proposals. He said that when the settlement was entered into he thought that the plaintiff was going back to work. The plaintiff testified that he had never told George Ginos that he and his father were going to conduct the settlement negotiations and that he did not direct George Ginos not to negotiate his case. The plaintiff stated that he believed he had not discussed the structured settlement with George Ginos but that he had talked with George Ginos' son and his secretary.

James Duncan, a claims supervisor for Country Mutual Insurance, testified that the limits of liability on the defendant's policy were $100,000 per person. He indicated that his file contained Dr. Marese's narrative report describing the plaintiff's prognosis as "guarded." He indicated further that, based on the information in the file and what the plaintiff had told him, he had felt that there was a "good chance" that the plaintiff would soon be able to return to work. He had first conferred with the plaintiff in January of 1985, at which time he considered plaintiff's demand of $500,000 unreasonable. He stated that the plaintiff had indicated that he had had an attorney with whom he had spoken, but that he had not hired the attorney and was still conducting his own negotiations and representing himself. Although the plaintiff indicated at the end of that conversation that he would be hiring George Ginos, and the witness said that he would wait to hear from the attorney, late in March or early in April of 1985 the plaintiff stated to him that he had changed his mind and that he was representing himself, saying "that he didn't want an attorney coming off with a lot of his money." The witness indicated that after that time the plaintiff "was always wanting to talk to somebody from the company to go forward with the negotiations." On April 19, 1985, the witness talked with plaintiff and his father, at which time plaintiff was, he said, "certain" that he preferred a 15-year deferment as opposed to a 10-year one:

> "And I think it meant a great deal to him that the 15-year deferment would net him almost a half a million dollars, which was his original demand, because he made the comment and kind of laughed and said, 'Well, I wasn't so far off in my de-

mand originally after all and you guys eventually ended up paying.' ''

The witness stated that he had relied upon Dr. Marrese's report because he had been the plaintiff's surgeon and the report was comprehensive and "seemed to summarize everything." The witness said he was never certain, while the settlement was negotiated, of the date on which the plaintiff would return to work. He testified that during the 30 days before the release was executed there were "at least six or eight times" when the plaintiff and the witness or other members of the insurer's staff were in communication "[a]nd most of it was initiated by Mr. Wieneke wanting to know how soon, you know, were we going to be able to make the settlement and how soon was he going to get his money." The witness, plaintiff, and plaintiff's father were present at the execution of the release. Neither plaintiff, who was approximately 23 years of age at that time, nor his father requested a delay so that an attorney or anyone else might be present. The witness denied that he had threatened to prolong the matter if the plaintiff refused to execute the agreement.

The plaintiff testified that from the time of the accident until May 20, 1985, he had talked with George Ginos "at least once a day probably, sometimes twice a day." He said that George Ginos had "never actually helped" him in negotiating a settlement of his case: "At the time that all this came up, he was on vacation." During the period of settlement negotiations, he said, George Ginos was out of town: "I had nobody else to speak to except my father." George Ginos had told him earlier, he said, that he was going to ask for $500,000. At the time he executed the release he understood that he was about to return to work. He stated that on May 20, 1985, immediately before signing the release, he had asked James Duncan "what would happen if there was more medical bills, what would happen if there was, you know, something came up in, you know, my health or something" and that that was how he had learned about the assignment of benefits: "That they know [sic] they weren't going to give me anything else, but I could use the assignment part of the policy for money." He testified that on "several occasions" he had told James Duncan that he wanted to review the document with an attorney but that he had responded, " 'No. If we're going to do it, we're going to do it now' '' and that on May 20, 1985, when the release was executed he had said "it would be a long time before I ever saw any money, he could make sure of that, they would draw it out in court." He stated that he had never told James Duncan that he did not want to have an attorney represent him because he did not want the attorney to take a large

part of his settlement. During the 30 days prior to execution of the release he had, he said, "[p]ossibly" called the insurer at least three times a week wanting to know if settlement could be made soon; he had made the calls himself. After his operation he had demanded of James Duncan $500,000 to settle the claim. He had chosen the 15-year deferment rather than the 10-year one because it would pay more money "in the long run." He stated that when he executed the release he had told James Duncan he was happy because the amount of money, including the annuity in the sum of about $442,000, that he would receive approached the $500,000 he had originally requested. At the time he signed the release he understood, he said, that it applied to all claims for damages that had occurred in the past as well as any that might arise in the future. He had seen a doctor last in approximately December of 1987 and has received no medical treatment for his back since that time.

In its judgment the trial court stated among its extensive findings:

> "Plaintiff knew when he executed the release that only two months had passed since his surgery, that there was a 25% chance of a prolapsed disc and that his doctor's prognosis for him was 'guarded.' Thus plaintiff has failed to prove by clear and convincing evidence that he did not make the settlement in spite of unresolved physical problems of which he was aware.
>
> The settlement was reached eleven months after the occurrence and it was plaintiff who pressured Country Companies to come to a settlement, not *vice-versa*. Thus plaintiff has failed to prove by clear and convincing evidence that the insurance adjuster pressured him into signing the release.
>
> The plaintiff consulted at least ten health care professionals and, repeatedly, an attorney before he executed the release over the eleven months between the occurrence and the settlement. Thus plaintiff has failed to prove by clear and convincing evidence that he did not have ample time to consult with physicians and attorneys.
>
> The consideration given for the release, whether viewed from the insurance company's perspective ($66,000.00) or from plaintiff's perspective ($475,000.00+) is not nominal. Plaintiff will receive very close to what plaintiff demanded in settlement. And even considering plaintiff's prolapsed disc, additional claimed lost wages, additional medical expenses and the claimed permanent nature of his disability the amount to be re-

ceived by the plaintiff as a result of this settlement is not 'unconscionable.' "

■ The trial court plainly resolved certain questions pertaining to the credibility of the witnesses against the plaintiff, as is within its province to do as trier of fact. Its judgment that the plaintiff failed to prove by clear and convincing evidence that there was a mutual mistake of material fact and that the result is unconscionable is not contrary to the manifest weight of the evidence. Accordingly, we do not disturb it. The judgment in favor of the defendant Bernard Weitekamp and against the plaintiff is affirmed.

With respect to the granting of summary judgment in favor of Nokomis Township, plaintiff contends that the record establishes that there are issues of fact as to who controlled the storm inlet, which should have precluded entry of summary judgment. In his second amended complaint the plaintiff alleged that Nokomis Township had been negligent for failure to provide warning of or to barricade the storm sewer; for failure to maintain the storm sewer in a safe and suitable manner; for failure to erect and construct the storm sewer properly so as not to create a dangerous condition; or for allowing the storm sewer to exist in close proximity to a public thoroughfare in a dangerous condition. Summary judgment shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).

In support of its motion for summary judgment, Nokomis Township submitted the affidavit of Arthur J. Loebach, superintendent of highways for the County of Montgomery, who stated that in this capacity he has knowledge of all roadways and bridges under his supervision and required to be maintained by Montgomery County. He stated that the roadway in question, Illinois Route 16, is under the control of and is maintained by the State of Illinois. Further, the affiant stated:

> "[N]either the County of Montgomery nor any of its employees, agents, or assigns are responsible for the design, maintenance, care or control of the highway and specifically of the drainage area which is alleged by Plaintiff to be defective and a proximate cause of Plaintiff's injuries. Said highway and drainage area were designed and remains [sic] under the custody and control of the State of Illinois."

Arthur Loebach testified in a discovery deposition taken on October 19, 1987. This deposition was submitted in support of the motion

for summary judgment of the defendant Montgomery County that was granted by the trial court on November 28, 1988, prior to the granting of the motion of the defendant Nokomis Township for summary judgment on September 15, 1989. Both the plaintiff and the defendant Nokomis Township rely upon this deposition in their briefs. The witness indicated that his department had surveyed the area in question "trying to figure out who really does have jurisdiction over this particular inlet." The witness stated that since the catch basin or inlet is over 10 feet inside the existing right-of-way of the State of Illinois, he assumed that the maintenance of the inlet fell within the jurisdiction of the State of Illinois. He stated that "[a]ny distance inside the right-of-way should be maintained by the State of Illinois" and that "this happens to be well within that boundary. It is not even close to the right-of-way line. It is eleven point three (11.3) feet inside." He expressed the belief that he has no responsibilities with respect to maintenance within the limits of the right-of-way of the State of Illinois. Since November 1987, he said, his department has maintained the "stop ahead" signs. It also maintains the green rural reference signs, but "[a]s far as directional, warning, regulatory signs, to our belief they are all State of Illinois Highway Department." He described the jurisdictional relationship between the Superintendent of Highways of Montgomery County and Nokomis Township as strictly "advisory." The witness, who did not hold his present office on the date of the accident, indicated that if his office sees or knows of a dangerous situation, it will voluntarily so advise the township. Asked whether the county has the authority to make the change without action by the township, he answered, "If worse came to worse and it was a dangerous situation, yes, we would. We would have to." Asked, "In other words, had the township come to you with respect to the particular intersection of TR-123 [Nokomis Township Road] and Illinois Route 16, with respect to certain questions relevant to the catch basin, would your office have rendered or served in an advisory capacity in that sense?" the witness answered, "My answer at that point would have been to stay away from it. We did not have jurisdiction over it." He indicated again that the jurisdiction belonged to the State of Illinois. He testified he does not know how old the catch basin is but that to his knowledge the highway commissioner for the Nokomis Township Road District has never performed any maintenance work on this catch basin or inlet. Asked, "With respect to your conversations with any of the persons involved with the Illinois Department of Transportation, have they ever taken a position as to whether or not it is or is not their inlet or catch basin?" the witness re-

sponded, "They don't know." He did not know whether the Illinois Department of Transportation has exercised any maintenance or control over the catch basin. In his opinion, the catch basin or inlet did not fall within the jurisdiction of Nokomis Township or the Nokomis Township Road District.

Rae E. West testified by discovery deposition taken on August 18, 1988, that he had retired in September of 1987 as highway commissioner of Nokomis Township. During his 10-year tenure, he said, he had never been advised by the county road commissioner that there was something wrong with one of his township roads and that he thought he ought to fix it. Concerning the relationship between his office and that of the Montgomery County road superintendent, he said, "If something comes up where we don't fully understand, all commissioners will go down and talk to our highway superintendent"; "[a]ll the township road commissioners are supposed to work together along with the county road commissioner." He testified that the State of Illinois maintains the approach, called an "apron," to all State highways: "The state takes care of that. All aprons, we are not allowed to mess with the aprons at all on the highways." He stated further, "We are not allowed behind the apron or up on the apron. We can't oil it." The apron of State Route 16 extends for 13 feet and 8 inches away from the highway itself. He described the apron as being part of the State highway system. The township road runs right up to the apron of the State highway. "Even if there are holes, we can't go in and patch the aprons. There is no way." He indicated that his office does no maintenance work at all for a distance of 13 feet and 8 inches from the right-of-way line of Illinois Route 16. Nokomis Township has never maintained the catch basin or inlet. He testified that when the State blacktopped and improved the shoulder of the highway "they blacktopped around that catch basin." He would not have put blacktop around the catch basin, he said, because to do so "built it up higher"; on the contrary, he would have raised the grade so that it was even with the road if he were going to blacktop around the inlet. Asked whether he had records at his facility that would indicate that his office had installed the inlet in question, the witness responded, "I don't know why the township would install that there. I don't know why there would be a reason to put it there, because that carries state water." The purpose of the catch basin is, he said, to get rid of water from the State highway. The apron is "basically the slope, what the state wants to do is make sure there is proper slope from the state highway that is usually higher." "So they have to put those aprons," or ramps, "out there if they want Route 16 to be much

higher than our road." When the apron is not at an intersection of a road, as here, the apron forms the shoulder of the road. He indicated that the "County" had told him that the catch basin did not fall within the right-of-way of both the State and the township.

Leslie E. Nichols, a district maintenance engineer for the Illinois Department of Transportation, testified in a discovery deposition taken on February 11, 1988. His district includes all of Montgomery County; crews under his authority are responsible for the maintenance and care of Illinois Route 16 in Montgomery County. He stated that local authorities are responsible for maintaining a side road or a road crossing Illinois Route 16 "[r]ight up to our pavement edge." He described this as a statewide, not a local, policy. He stated that, with regard to a side road or a crossroad, "[g]enerally," even though a particular inlet or drainage system may fall within the State right-of-way, the maintenance requirements are placed upon the local entity, and those requirements run generally to the pavement edge, not to the edge of the shoulder. He described the inlet as being within the existing right-of-way of both Illinois State 16 and TR 123, that is, Nokomis Township Road. The inlet appears to be six feet from the surface edge and in the shoulder of Illinois Route 16 and about 5½ feet from the surface edge and in the shoulder of Nokomis Township Road. Thus, the right-of-way of the State and the right-of-way of the township overlap. The witness stated that the inlet is connected to a culvert running under the State highway and, he had been told, a pipe running under the township road.

He testified that he had "no idea" who built the inlet and that, because the inlet does not appear in files available to him, he does not know who is officially responsible for it. He indicated that "[i]f it could be proven that our maintenance crews built the inlet, I would say it would be our jurisdiction" and that if it was determined that the township had established the inlet, he would say that it was the township's jurisdiction and responsibility. The State has done no maintenance on the inlet; there has been no need to do any maintenance on it. About six to eight months earlier he had observed fairly fresh asphalt, about two to three years old, close to the inlet, but he did not know who had put it there. In an attempt to obtain records concerning the inlet, the witness discovered that "a bunch of records" had been destroyed in a fire or flood "sometime back in the 60's." Records brought by the witness showed the original culvert but did not show any additions that could be construed to be inlet construction. His records showed that Illinois Route 16 was resurfaced and perhaps widened in 1952 and widened slightly and resurfaced in 1979. He

stated, "We have looked for records. We have no records" pertaining to the ownership of the inlet.

The Department of Transportation attempted to determine who owned the inlet but was unable to make that determination. The witness speculated that the inlet was installed sometime between 1952 and 1972. If either the township or county had installed the inlet on the State's right-of-way, either one would have had to obtain permission in the form of a permit or an approval letter from the Illinois Department of Transportation in order to do so. The witness had not found any such permit. In this regard the following questions were asked and answers given:

"Q. Is it the policy of the Department of Transportation that they approve any type of maintenance which the township or county might do in regards to an instance such as this inlet, with regard to erection of the inlet or maintenance of the inlet they would be required to obtain permission from the state in order to modify or erect or maintain the inlet in any way?

A. Generally yes, that would work through our bureau of local roads and streets. They deal direct with the counties and townships, cities, counties and townships. If they had reconstruction or some additional high type maintenance, whatever term you want to use, probably they would be in contact with the people in the local roads bureau, and probably there would be an approval letter, because they might have wanted to expend some motor fuel tax funds. If that was the case, the office would have to give them the approval to do that.

Q. The other alternative possibility might be that if there is no record of the permit or approval letter or so forth it might have also been erected by the state?

A. It's a possibility."

Asked how a determination would be made as to who was responsible for the inlet if a problem arose, the witness responded, "Well, the best way would be to get directly in contact with the township and just work out the problem between the two of us." Asked further, "What factors would be considered in determining who was responsible for maintenance, maintenance of the inlet?" the witness answered, "First of all if he knew, he had any knowledge that his organization built it, then I would say it was his. Now, I have heard this like you heard it, nobody seems to know when it was built, and here we are back to square one as they say." He stated that, in general, whoever erected the inlet would be responsible for its maintenance unless it has been transferred by a legal document transferring a road system,

for example. One item, such as an inlet, would not be transferred. Asked whether there are any other factors that would be considered to determine who is responsible for maintenance, other than the entity that erected or built the inlet, the witness answered, "Anything in the file in the form of a permit or letter of authorization for the construction of it. That would be the basic determination of who owned it." He described the inlet as being in a low area. There is a depression around the inlet so that it will drain; if it were too high, it would not drain or pick up any surface water. His office has received no complaints about the inlet.

In its judgment entered September 15, 1989, granting the motion of Nokomis Township for summary judgment, the trial court found in part as follows:

"The record reflects the following facts:

a) The storm sewer is located on real estate where the right-of-way of the State of Illinois and the defendant Township overlap, *i.e.*, an intersection of a township road and a state highway.

b) The storm sewer is designed and installed to drain rain water off of the state highway.

c) The Township's highway officials believe the storm sewer was installed and maintained by the State. The State's highway officials have neither an opinion nor record to the contrary and plaintiff has no evidence to the contrary."

The trial court found further:

"In the instant case, plaintiff must offer evidence sufficient to tip the scales in favor of the alleged instrumentality being under the creation or maintenance of defendant township to establish a duty. This he cannot do. At best the matter is in equipoise and no duty is, therefore, established or establishable."

The trial court concluded that summary judgment should be entered in favor of Nokomis Township and against the plaintiff for failure to state facts or inferences from facts sufficient to set up a *prima facie* showing of a legal duty to plaintiff concerning the inlet in question.

■ In light of the evidence, and particularly the absence of records and other evidence to show that Nokomis Township had any jurisdiction over or responsibility concerning the inlet, we conclude that no genuine issue as to any material fact exists with regard to the duty of Nokomis Township to the plaintiff to construct or maintain the inlet, to warn of or barricade it, or to take any action concerning it, as alleged by plaintiff. Thus, the trial court did not err in granting the motion of Nokomis Township for summary judgment. Hence, we

affirm the judgment. In view of our disposition concerning this issue we need not consider the other issue plaintiff raises concerning the granting of summary judgment in favor of Nokomis Township.

■ We turn finally to the issue presented concerning the judgment for summary judgment entered by the trial court in favor of the defendant Montgomery County and against the plaintiff. In his second amended complaint the plaintiff made the same allegations of negligence with respect to Montgomery County that he made with regard to Nokomis Township. We have already determined that the trial court properly entered judgment in favor of Nokomis Township. Under these circumstances there can be no duty owed by Montgomery County to the plaintiff concerning the inlet. Inasmuch as no genuine issue exists with regard to the duty of Montgomery County to the plaintiff to take action as alleged, the trial court did not err in granting summary judgment in favor of Montgomery County and against the plaintiff. The judgment is affirmed.

Affirmed.

WELCH, J., concurs.

JUSTICE HARRISON, concurring in part and dissenting in part:

I concur in the majority's disposition of plaintiff's claim against Bernard Weitekamp, but dissent from its affirmance of the circuit court's judgment in favor of Nokomis Township and Montgomery County. The circuit court entered summary judgment for Nokomis Township on the theory that plaintiff had failed to offer sufficient evidence to "tip the scales" in favor of his theory of recovery. As this court recently held, however, a hearing on a summary judgment motion is not a minitrial. The party opposing the motion is not required to try its case at that time. (*Hall v. Stamm* (1991), 208 Ill. App. 3d 83, 85, 566 N.E.2d 995, 997.) Rather, the party moving for summary judgment is obligated to demonstrate the absence of factual dispute with respect to all issues raised by the pleadings. *West Suburban Mass Transit District v. Consolidated R. Corp.* (1991), 210 Ill. App. 3d 484, 488, 569 N.E.2d 187, 190.

In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent. (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271, 586 N.E.2d 1211, 1215.) Summary judgment is improper when there is a dispute as to a material fact or

when material facts are undisputed but reasonable persons may draw different inferences from those facts. (*Lehrman v. South Chicago Cable, Inc.* (1991), 210 Ill. App. 3d 346, 351, 569 N.E.2d 99, 102.) This is such a case.

The inlet which allegedly caused plaintiff's injuries was not a natural formation. It had to have been constructed and maintained by Nokomis Township, Montgomery County, or the State. No other possibilities were suggested. Although the township and county disavow any responsibility, the district maintenance engineer for the Illinois Department of Transportation testified in his discovery deposition that inlets such as this may be the responsibility of local governmental entities even where, as here, the inlets fall within the State's right-of-way.

The same engineer further testified that the local governmental units would have required a permit had they actually constructed the inlet, and I recognize that no such permit was produced. The absence of such a permit, however, is scarcely dispositive. Plaintiff's cause of action against the county and township is not premised solely on the proposition that those entities were negligent in constructing the inlet. Plaintiff also alleged negligent maintenance of the inlet. On that claim, the issue of a permit was irrelevant. In any case, I fail to see how any real significance can be given to the absence of a permit considering that a fire or flood had rendered the State's records incomplete.

The circuit court found the matter here to be in "equipoise," which means "[a] state of equal balance" (30 C.J.S. *Equipoise* §757 (1965)). Implicit in this conclusion is that the court engaged in weighing of the evidence. That was wholly improper. It is fundamental that on a motion for summary judgment neither the trial court nor the reviewing court may weigh the evidence. (See *Russell v. Subbiah* (1986), 149 Ill. App. 3d 268, 273, 500 N.E.2d 138, 142 (Barry, J., dissenting); *Fletcher v. Boxx* (1973), 10 Ill. App. 3d 928, 931, 295 N.E.2d 248, 250.) As vexing as the evidence may have been to the trial judge, he was not the trier of fact. The jury was, and plaintiff should have been permitted to present to the jury his claims against the township and the county. I would therefore reverse the entry of summary judgment against plaintiff on those claims and remand for further proceedings.